Richard K. Walker, SBN 004159
**WALKER & PESKIND, PLLC**
Bay Colony Executive Center East
8777 E. Via De Ventura, Ste 315
Scottsdale, Arizona 85258
rkw@azlawpartner.com
Phone: (480) 483-6336
Facsimile: (480) 483-6337
*Counsel for Plaintiff Sara Scott*

**WALKER & PESKIND, PLLC**
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

IN THE UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF ARIZONA

| | |
|---|---|
| Sara E. Scott, | **CASE NO.:** |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| Liberty Mutual Group, Inc., | |
| Defendants. | |

COMES NOW Plaintiff SARA E. SCOTT ("MS. SCOTT" or "Plaintiff"), by and through her undersigned counsel, Walker & Peskind, PLLC, and for her Complaint against Defendant LIBERTY MUTUAL GROUP, INC. ("LIBERTY MUTUAL" or "Defendant"), alleges upon personal knowledge as to her own status and acts and as to the known unlawful acts and omissions of the Defendants, and upon information and belief as to all other matters, as follows:

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

# I.  NATURE OF THE ACTION

1.    This is a civil action asserting federal statutory claims for sex discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.; and for age discrimination and retaliation pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq*.  In addition, Plaintiff asserts herein further civil claims arising under the laws of the State of Washington, including the Washington Law Against Discrimination, RCWA §§ 49.44.090 and 49.60.010, *et seq*.; Washington statutes governing employee wage payments, RCWA §§ 49.48.010, 49.48.150, *et seq*., 49.52.050, and 49.52.070; and the Washington common law of contract, unjust enrichment, the implied covenant of good faith and fair dealing, negligent training and supervision, intentional infliction of mental distress, , and tortious interference with contractual relationship and business expectancy.

2.    Plaintiff's discrimination claims are based on, and arise out of, various and numerous acts of unlawful discrimination, harassment, and retaliation against her because of her sex and age, and her exercise of rights under applicable State and federal anti-discrimination laws.

3.    Additionally, Plaintiff seeks remedies herein under the laws of the State of Washington for Defendant's breach of contractual obligations to her, its unjust retention of benefits created by her without compensating Plaintiff for the value of those benefits, its failure to pay Plaintiff compensation and to reimburse her legitimate business expenses as required by Washington law, its failure to cooperate to permit Plaintiff to obtain the full benefit of performance under their contractual relationship, its failure to

2

supervise those in positions of authority over Plaintiff to prevent them from retaliating and otherwise treating Plaintiff abusively and unlawfully, its infliction of severe emotional distress on Plaintiff, and its countenancing the tortious interference by those in positions of authority over Plaintiff in her contractual relationship with Defendant and in her business expectancy of being able to continue to perform at high levels in the medical stop-loss insurance sales industry.

## II. PARTIES, JURISDICTION, AND VENUE

4.     Plaintiff is a natural person, female, over the age of 40, and she is, and at all times relevant has been, a citizen and domiciliary of the State of Washington.

5.     Defendant LIBERTY MUTUAL is a corporation organized under the laws of the Commonwealth of Massachusetts, with its principal place of business in Boston, Massachusetts.    At all times relevant, LIBERTY MUTUAL was authorized to do business in the States of Arizona and Washington.

6.     The principal acts, events, and injuries described herein and giving rise to Plaintiff's claims occurred and/or caused injury to Plaintiff in the States of Arizona, California, Colorado, and Washington, among others.

7.     Plaintiff filed Charge No. 523-2020-0026 with the United States Equal Employment Opportunity Commission ("EEOC") on November 15, 2019, alleging sex discrimination and retaliation for her involvement in having reported an incident of sexual harassment to which she had been subjected.    At the time she filed the aforementioned EEOC Charge, MS. SCOTT also filed with the EEOC a detailed account of the discrimination, on the basis of both sex and age, to which she had been subjected.

3

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

8.    On May 29, 2020, MS. SCOTT amended Charge No. 523-2020-0026 to expand the Charge's description of discriminatory and retaliatory treatment to which she had been subjected, and to explicitly state that she had also been subjected to discrimination on the basis of her age in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et. seq.*

9.    On October 2, 2020, MS. SCOTT was constructively discharged by LIBERTY MUTUAL.  She contacted the EEOC promptly thereafter and asked if she could amend Charge No. 523-2020-0026 to include an allegation for the termination. She was told, however, that she would need to submit a new charge based on the discharge.

10.    The EEOC issued a notice of right to sue, pursuant to 29 C.F.R. § 1601.28(a)(1) and (e), to MS. SCOTT based on Charge No. 523-2020-0026 on March 8, 2021, which was received in the office of MS. SCOTT's legal counsel on March 15, 2021.

11.    Jurisdiction is vested in this Court over MS. SCOTT's claims arising under federal law by virtue of 28 U.S.C. §§ 1331 and 1343, 29 U.S.C. §§ 217 and 626(c)(1), and 42 U.S.C. § 2000e-5(f)(3).

12.    Supplemental jurisdiction over Plaintiff's claims arising under the statutes and common law of the State of Washington lies in this Court pursuant to 28 U.S.C. § 1367.

13.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(3) and a stipulation of the parties.

4

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

### III.    GENERAL ALLEGATIONS

#### Liberty Mutual's Acquisitions Pertinent To Ms. Scott's Claims

14.    LIBERTY MUTUAL is a diversified mutual insurer with consolidated assets exceeding $130 billion, operations in at least 29 countries, and over 50,000 employees in over 800 offices worldwide.

15.    Effective May 1, 2017, LIBERTY MUTUAL acquired specialty lines insurer Ironshore, Inc. ("Ironshore"), including on information and belief Ironshore's medical stop-loss insurance business.

16.    With the Ironshore acquisition, LIBERTY MUTUAL also acquired and retained certain members of Ironshore's management team, including Matthew Dolan, Lanie Dorneker, and Theresa Galizia.

17.    Also in the second quarter of 2017, LIBERTY MUTUAL acquired TRU Services, LLC ("TRU"), a Massachusetts-based managing general agent specializing in medical stop-loss insurance products for mid- to large-sized medical plan sponsors.  With regard to this acquisition, a senior Liberty Mutual executive stated: "As we look to expand our product offerings, medical stop loss offers an exciting opportunity . . . and the acquisition of an industry leader like TRU gives us a strong foothold in the market." www.businesswire.com/news/home/20170321006538/Liberty-Mutual-Insurance-Acquires-Assets-Medical-Stop.    With regard to TRU's acquisition by LIBERTY MUTUAL, Jerry Trupiano ("Mr. Trupiano"), co-founder of TRU who joined LIBERTY MUTUAL and continued managing TRU's operations after the acquisition by LIBERTY

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

MUTUAL, stated: "Liberty Mutual provides a terrific platform for the TRU team to continue to grow and develop the business we've built up over the past two decades." *Id.*

18.    After the TRU acquisition, it was folded into Ironshore, which continued to operate under its own brand as a LIBERTY MUTUAL company.

## Recruitment Of MS. SCOTT By LIBERTY MUTUAL And The Terms Of Her Employment

19.    Prior to joining Liberty Mutual, MS. SCOTT enjoyed a well-established national reputation as one of the stars and leading producers in the medical stop-loss insurance sales field, with a long track record of producing extraordinary sales results.

20.    MS. SCOTT was aggressively recruited by the LIBERTY MUTUAL/ IRONSHORE/TRU sales management team, including Mr. Trupiano.

21.    On June 29, 2018, Liberty Mutual sent Ms. Scott an offer letter, in which she was offered, as an inducement, a "New Hire Bonus" in excess of $100,000 , due in two installments, one payable 30 days after commencement of her employment, and a second payable 60 days later.  The offer letter also provided that she would be paid an annual base salary, and would have the opportunity to earn "Incentive Compensation" under the terms of the Tru Account Executive Compensation Plan.  As a result of Ms. Scott's negotiations with the LIBERTY MUTUAL/IRONSHORE/TRU management team, it was agreed that she would be entitled to an agreed upon percentage commission as "Incentive Compensation" on premiums received by LIBERTY MUTUAL for all medical stop-loss product sales she originated, along with the same commission on any subsequent renewals in accounts she had generated, in addition to her base salary.  It was

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

further agreed that MS. SCOTT'S permanent territory, once she joined LIBERTY MUTUAL, would include the Western United States and seven, specifically named national insurance brokers and general agents including Stealth Partner Group (now an AmWins Company), Alliant Insurance Services, ACE, and Benefit Partners. It had been in this territory and with these national brokers and general agents that MS. SCOTT had spent years and tremendous effort developing an extensive network of contacts that had been instrumental in her outstanding sales performance up to that time. She was also assured that neither her compensation arrangement nor her territory (including the seven national brokers and general agents with which she had extensive history) would change once she joined LIBERTY MUTUAL.

22.    During MS. SCOTT's recruitment by the LIBERTY MUTUAL/ IRONSHORE/TRU sales management team, she was repeatedly told that she was being brought on board to help build up LIBERTY MUTUAL's presence and book of business in the medical stop loss insurance industry based on the stellar record she had accumulated over a number of years of producing extraordinary sales results for medical stop loss insurance products.

**Commencement Of MS. SCOTT's Employment
With LIBERTY MUTUAL And Early Sales Successes**

23.    Relying on the assurances she had been given during her recruitment, MS. SCOTT agreed to join LIBERTY MUTUAL, despite the fact that she would be taking a reduced base salary from what she was then earning with her prior employer with no guaranteed minimum compensation above her base salary. She did this because she was

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

fully confident that, with commissions on sales and renewals, she would be able to generate excellent income for herself while also producing great results for LIBERTY MUTUAL. At the time MS. SCOTT decided to accept LIBERTY MUTUAL's offer and join its medical stop-loss sales force, she had every intention to, and every expectation that she would, finish out her career and ultimately retire from there.

24.     MS. SCOTT'S employment with LIBERTY MUTUAL commenced on July 16, 2018.

25.     At the time of MS. SCOTT'S hire by LIBERTY MUTUAL and continuing throughout during her tenure there, she was the only female member of the medical stop-loss sales force, and she was older than all but one of the males in the department.

26.     At the time Plaintiff joined LIBERTY MUTUAL, its sales volume with what had for some time been her largest (by sales volume) client was about $1.4 million annually. Within six months of commencing her employment with LIBERTY MUTUAL, she was able to increase LIBERTY MUTUAL's sales to that client alone to approximately $25 million.

27.     During her first year with LIBERTY MUTUAL, MS. SCOTT originated about $27 million in sales, which represented about twice the sales volume generated by the combined efforts of the rest of LIBERTY MUTUAL's medical stop-loss sales force, all of whom were male and most of whom were younger than Plaintiff.

**MS. SCOTT's Encounter With Sexual Harassment
And The Campaign Of Harassment And Retaliation and Discrimination
To Which She Was Thereafter Subjected**

8

28.    On March 26, 2019, MS. SCOTT was subjected to a sexually harassing encounter, including an attempt at extortion, by a male LIBERTY MUTUAL medical stop-loss sales employee.

29.    The male harasser told MS. SCOTT that he attributed her sales production successes to "tools" she had that he did not, all the while leering suggestively at her breasts and pelvic area, and he suggested that she should pay him not to make a big deal out of her not coming into the office.  With regard to this latter comment, MS. SCOTT'S supervisor had, at the time she began working for LIBERTY MUTUAL, approved her doing almost all of her work either from home or on travel at the far-flung locations of sales prospects, and there had never been any suggestion from LIBERTY MUTUAL management that she would be expected to work from any of LIBERTY MUTUAL's office locations.

30.    MS. SCOTT found the encounter with the male harasser to be very shocking, upsetting, and demeaning, and she reported as much to her supervisor the very next day.

31.    Plaintiff followed up her oral report of the sexual harassment incident with an email to her supervisor and to Theresa Galizia ("Ms. Galizia") a few days later, MS. SCOTT, again emphasizing that she had found the encounter to be very offensive.

32.    Ms. Galizia telephoned MS. SCOTT a few days after having received the email.  In the ensuing conversation, Ms. Galizia repeatedly gave the impression that she did not believe MS. SCOTT's report of the incident.  When Plaintiff asked Ms. Galizia

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

9

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

about this, the latter brushed aside the question, saying it was her first Human Resources ("HR") incident and she would have to discuss it with HR personnel.

33.    About a week after the telephone conversation with Ms. Galizia, MS. SCOTT received a phone call from a representative of LIBERTY MUTUAL's HR Department, who said she would conduct a confidential investigation into the matter.

34.    The following day after the sexual harassment incident and at the same meeting, MS. SCOTT attended a meeting with LIBERTY MUTUAL's stop-loss sales personnel, where she was approached by Matthew Dolan ("Mr. Dolan"), the former President of Ironshore, who had been appointed in or about May of 2018 to the position of President of North American Specialty within LIBERTY MUTUAL's Global Risk Solutions Division.  Lanie Dornecker ("Ms. Dornecker") reported directly to Mr. Dolan, and Ms. Galizia reported to Mr. Dolan through Ms. Dornecker.

35.    At the March 2019 meeting, Mr. Dolan introduced himself to MS. SCOTT, said he had heard a lot about her and had been watching her, and expressed interest in knowing more about Stealth Partner Group, a major stop-loss broker (the largest in the industry) and with which he was aware that MS. SCOTT had worked for a number of years prior to joining LIBERTY MUTUAL.

36.    At the conclusion of their conversation, MS. SCOTT told Mr. Dolan that she knew representatives of Stealth would like to establish a relationship with someone at the senior executive level within LIBERTY MUTUAL, and she asked if Mr. Dolan would like to meet with them.  Mr. Dolan replied in the affirmative, suggested that he and MS. SCOTT go to meet with Stealth's representatives in May of that year, and asked her

to send him a reminder note so he could find a window in his calendar when such a meeting could take place.

37.     MS. SCOTT did as Mr. Dolan had asked and sent him the reminder note he had requested.   On April 18, 2019, however, she received an email from Ms. Galizia, who had been present during MS. SCOTT's encounter with Mr. Dolan, stating that MS. SCOTT was permitted to communicate with Mr. Dolan only through Ms. Dornecker and Ms. Galizia.   In a follow-up telephone conversation, Ms. Galizia archly stated to MS. SCOTT that Mr. Dolan had no idea who MS. SCOTT was, dressed her down for deigning to communicate directly with him, and told her in no uncertain terms that she was never to do it again.

38.     In early May of 2019, MS. SCOTT received a telephone call from a male LIBERTY MUTUAL sales employee who told her that, in a lengthy dinner meeting with Ms. Galizia and Ms. Dornecker, they had told him all about the sexual harassment incident MS. SCOTT had reported.   A few days later MS. SCOTT telephoned the HR representative who had assured her that the investigation of that matter would be handled confidentially, but who acknowledged during the call that the promised confidentiality had been breached.   When MS. SCOTT reported this to her own supervisor, he was shocked and expressed concern that the disclosure could adversely affect her internal working relationships.

39.     In late May of 2019, MS. SCOTT discovered that Ms. Galizia and Ms. Dornecker had invited a male LIBERTY MUTUAL sales employee to attend a meeting with the head of carrier relations with Stealth Partner Group, MS. SCOTT's largest (by

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

sales volume) and most important broker-client (the same client about which Mr. Dolan had asked MS. SCOTT and had expressed interest in meeting together with her), but were excluding MS. SCOTT from the meeting, despite her relationship of many years with the client. The male employee invited by Ms. Dornecker and Ms. Galizia to attend the meeting with MS. SCOTT's client (the same individual who had told MS. SCOTT that Ms. Dornecker and Ms. Galizia had told him all about the sexual harassment incident reported by MS. SCOTT (see ¶ 38, *supra*)) had had no prior relationship with the client and had sales production figures that were but a small fraction of MS. SCOTT's.

40. In the middle of June 2019, MS. SCOTT discovered that none of her $signing bonus, in excess of $100,000, (see ¶ 21, *supra*), which had been due in equal instalments in August 2018 and January of 2019, had been paid. Although these amounts were eventually paid by LIBERTY MUTUAL, MS. SCOTT was never given an explanation as to why the payments had not been made when due, nor was she paid any interest on the past due payments.

41. Also in the middle of June 2019, MS. SCOTT discovered that about eight months of business expenses she had previously submitted had never been paid, and that the expense reports she had submitted to obtain reimbursement had somehow mysteriously gotten lost in LIBERTY MUTUAL's system. When she reported this to her manager, he directed her to reconstruct and resubmit the expense reports that had inexplicably gone astray in LIBERTY MUTUAL's system. This was easier said than done, however, because MS. SCOTT no longer had the original itemized receipts that had been submitted with her previously submitted expense reports, and she had to spend

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

considerable time digging through past credit card statements, assembling the limited receipts still in her possession, and make estimates from memory for the rest. In many instances, she was unable to reconstruct with confidence expenses she had incurred, and was thus forced simply to omit those expenses and accept the fact that she would never be reimbursed for them. All of the expenses resubmitted by Ms. Scott had been expressly approved by her immediate supervisor, and some of them had previously been approved by Ms. Galizia.

42.     On July 16, 2019, MS. SCOTT learned from other LIBERTY MUTUAL employees that Ms. Galizia had directed changes in the underwriting guidelines to be used with Stealth Partner Group, MS. SCOTT's largest (by sales volume) client, some of which were extreme and were highly likely to discourage that client from doing future business with LIBERTY MUTUAL. Ms. Galizia had not bothered to inform MS. SCOTT of these changes, and Ms. Galizia had even directed other employees to go around MS. SCOTT and communicate the changes directly to the client, leaving MS. SCOTT out of the loop.

43.     Also in mid-July of 2019, MS. SCOTT learned from her co-workers that Ms. Galizia had announced to them, without informing MS. SCOTT, that LIBERTY MUTUAL medical stop loss sales for 2020 would be limited to $10 million, which was only about 37% of the sales MS. SCOTT alone had produced in 2019. The limitation Ms. Galizia had announced (apparently to the entire stop-loss sales force and other employees, with the exception of MS. SCOTT) would have the effect of reducing MS. SCOTT's incentive compensation year-over-year by at least two-thirds.

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

44.     MS. SCOTT also learned in mid-July 2019 that Ms. Galizia had begun a campaign calculated to undermine her with her coworkers by requiring them to copy Ms. Galizia on all communications such employees had with MS. SCOTT, and by asking questions and making comments about MS. SCOTT suggesting that Ms. Galizia disliked MS. SCOTT and was out to get her.  No such requirements were imposed with respect to comparably situated employees who were male and those both male and younger than MS. SCOTT, who had not reported any incidents of sexual harassment, nor did Ms. Galizia cast aspersions on male employees and those both male and younger who had made no reports of sexual harassment, as she did with regard to MS. SCOTT.

45.     On July 24, 2019, MS. SCOTT was contacted by the head of underwriting for Stealth Partner Group, her largest (by sales volume) client, who told her that Ms. Galizia had invited him and Stealth's head of carrier relations to a meeting with her, the recently promoted head of LIBERTY MUTUAL's medical stop-loss underwriting team, and a LIBERTY MUTUAL actuary.  This again was a meeting of which Ms. Galizia had not seen fit to inform MS. SCOTT, and to which she had not been invited.  The Stealth representative who had called MS. SCOTT to inform her of the meeting asked whether, in light of the fact that she had not been invited to the meeting, she was being "worked out" of the relationship with Stealth.

46.     On August 1, 2019, Ms. Galizia sent MS. SCOTT an email informing her that the expense reports she had been able to reconstruct and submit up to that point pursuant to her manager's direction, and that had been reviewed and approved by him prior their submission, had been "flagged for an audit given their lateness, the fact that

14

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

the corporate credit card was not utilized, and for general lack of documentation." Ms. Galizia also raised questions about why expense reports MS. SCOTT was still in the process of reconstructing had not yet been submitted, and about various expenses in the reports that had been submitted, questioning or even disallowing some of the expenses that had previously been expressly approved by MS. SCOTT's manager. Some of Ms. Galizia's questions and comments in this email were unclear to MS. SCOTT, so she asked for clarification and whether she could contact the auditor to gain a clear understanding of any errors needing to be corrected in the already submitted reports and what she needed to do to avoid repeating such errors in future reports. Neither Ms. Galizia nor anyone else in LIBERTY MUTUAL management ever responded to these requests.

47. On August 20, 2019, MS. SCOTT participated in a previously scheduled conference call with Ms. Galizia to discuss goals for 2020. It was in this conversation that Ms. Galizia informed MS. SCOTT, for the first time, that LIBERTY MUTUAL would be limiting its sales of medical stop-loss coverage in 2020 to $10 million. (See ¶ 43, *supra*.) Ms. Galizia acknowledged that this was at odds with the reasons MS. SCOTT had been brought into LIBERTY MUTUAL, but she then commented dismissively that that was "neither here nor there." Ms. Galizia then asked MS. SCOTT whether LIBERTY MUTUAL should not just terminate its relationship with Stealth Partner Group, MS. SCOTT's largest (by sales volume) client, a client with which MS. SCOTT had been specifically brought into LIBERTY MUTUAL to *expand* sales volume, which she had done very successfully, raising LIBERTY MUTUAL's sales to that client

15

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

from about $1.4 million to about $25 million in less than a single year. Ms. Galizia also announced to MS. SCOTT in this conversation that LIBERTY MUTUAL would be renewing about 60%-70% of its medical stop loss coverages with a premium increase of 14%-20%, but that for any renewals of coverages with MS. SCOTT's largest (by sales volume) client, the premium increase required would be 20%-25%. Ms. Galizia acknowledged that, with the changes she had announced during this telephone conference, MS. SCOTT would not be able to sell much new business going forward, but Ms. Galizia said MS. SCOTT would at least have a continuing stream of income from such renewals as could be secured, given the new premium increases from business MS. SCOTT had already brought in.

48.    In a follow-up call on August 30, 2019, Ms. Galizia told MS. SCOTT that she had decided not to terminate LIBERTY MUTUAL's relationship with Stealth Partner Group after all, but that the premium rate increase for renewals from that client would be 25%-30%, rather than the 20%-25% increase Ms. Galizia had announced in their telephone conference only 10 days earlier. Premium increases for other LIBERTY MUTUAL clients, including all those of sales personnel who were male and those both male and younger than MS. SCOTT, and who had reported no instances of sexual harassment, would continue to be held at 14%-20%, representing increase rates of between 44% and 53% less than the special increase rates Ms. Galizia was reserving exclusively for Stealth Partner Group, MS. SCOTT's largest client. In this conversation MS. SCOTT asked Ms. Galizia about why she was being excluded from the meeting with Stealth Partner Group, of which she had been made aware when a representative of the

client had called her and asked about it on July 24, 2019 (see ¶ 45, *supra*).  Ms. Galizia

archly asked how MS. SCOTT had learned of the meeting and said she did not know why

MS. SCOTT needed to be part of a renewal meeting.  Ms. Galizia later contradicted

herself in this regard, however, saying that, as "a highly compensated sales person," MS.

SCOTT was "charged with managing renewal messaging."  MS. SCOTT told Ms. Galizia

that she definitely wanted to participate in the meeting, and the latter agreed to send MS.

SCOTT an invitation.  In the event, however, Ms. Galizia never sent the promised

invitation.

49.     During the same August 30, 2019 telephone conversation, Ms. Galizia

asked MS. SCOTT whether she had updated everything pertaining to her business

expenses.  MS. SCOTT replied that she had not because she was still awaiting

clarification of the questions Ms. Galizia had raised during their conversation about this

matter on August 1, 2019 (see ¶ 46, *supra*), and MS. SCOTT said she was reluctant to

submit any further expense reports until she could be confident in her understanding of

what had been perceived as errors in the reconstructed expense reports she had submitted

previously.  To this, Ms. Galizia said that she was "sick" of dealing with this issue, and

that MS. SCOTT just needed to figure it out for herself.  MS. SCOTT asked if she could

at least speak with the auditor.  Ms. Galizia said she did not know, but would check.  MS.

SCOTT never heard anything further on this from either Ms. Galizia or any of LIBERTY

MUTUAL's auditors, and she never received any clarification of the issues raised by Ms.

Galizia in their August 1, 2019 conference call.

17

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

50.     Also in the August 30, 2019 telephone conversation, Ms. Galizia asked MS. SCOTT if she had been "tracking" her vacation.  MS. SCOTT said she had never been told that she needed to track her vacation and thus had not been doing it.  Ms. Galizia told MS. SCOTT that she was being "unprofessional," and directed her thenceforth to track her vacation.  In subsequent conversations with stop-loss sales personnel who were male and those both male and younger and who had reported no incidents of sexual harassment, MS. SCOTT learned that they had never been directed, by Ms. Galizia or anyone else, to track their vacation.

51.     On September 9, 2019, Ms. Galizia sent MS. SCOTT an email, directing her to provide Ms. Galizia with weekly call reports on MS. SCOTT's activities, including information on addresses where meetings had taken place, who the participants in the meetings were, topics discussed, etc.  In subsequent conversations with LIBERTY MUTUAL's male stop loss employees, MS. SCOTT was told that they had never heard of such a requirement and nothing of the sort had ever been required of them.  More than a month later, MS. SCOTT learned that a similar, though considerably less stringent, requirement had been imposed on the male stop-loss sales personnel.

52.     During a conference call with underwriting representatives of Stealth Partner Group, MS. SCOTT's largest (by sales volume) client, on September 11, 2019, Ms. Galizia said and did several things that appeared calculated to denigrate MS. SCOTT, to undermine her relationship with that client, and more generally to alienate the client's representatives who were on the call.  At one point during this call, Ms. Galizia suggested to the Stealth representatives that they reach out to their clients who had

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

purchased LIBERTY MUTUAL medical stop loss insurance products and ask that they agree to accept premium increases that were greater than the premium rate increase caps provided for in their contracts.   The reception to this suggestion by the Stealth representatives at the meeting was decidedly icy, and they told Ms. Galizia that any such suggestion would cause both Stealth and their clients to get their respective lawyers involved.

53.     On September 12, 2019, Ms. Galizia sent MS. SCOTT an email demanding that she complete, by the very next day, an Excel spreadsheet with 34 columns for all of her expenses over the past 18 months, many of which MS. SCOTT had already twice submitted.   MS. SCOTT responded to Ms. Galizia by email to tell her that she (MS. SCOTT) was in the middle of a 10-day business trip, did not have necessary documentation relating to her expenses with her, and would not be able to complete the spreadsheet as Ms. Galizia was demanding on a single day's notice.   Ms. Galizia responded saying that MS. SCOTT needed to arrange her schedule to meet Ms. Galizia's deadline, which necessitated MS. SCOTT's prematurely terminating her business trip, cancelling client appointments she was going to be unable to keep, and returning home immediately to meet Ms. Galizia's demand.

54.     On September 16, 2019, one of LIBERTY MUTUAL's underwriters sent an email to Stealth Partner Group, MS. SCOTT's largest (by sales volume) client, announcing that LIBERTY MUTUAL would no longer be quoting business with what is known as "the BUCAs" (Blue Cross, United Healthcare, Cigna, and Aetna).   Because much of MS. SCOTT's client's business was with the BUCAs, this was bound to have

19

1
2
3
4
5

significant impact on that client relationship, but MS. SCOTT was given no advance notice of it. When MS. SCOTT called the author of the email to enquire as to whether the decision not to quote business with the BUCAs applied to all LIBERTY MUTUAL medical stop-loss clients, she was informed that it was to apply only to her client.

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

55.     On September 17, 2019, only a little over a year after MS. SCOTT had joined LIBERTY MUTUAL, Ms. Dornecker and Ms. Galizia informed MS. SCOTT that they had decided to no longer pay incentive compensation on business with broker panels or general agents, the sources that had accounted for 100% of MS. SCOTT's LIBERTY MUTUAL sales portfolio up to that point, and that were the very sources MS. SCOTT had been brought into LIBERTY MUTUAL to develop. Ms. Dornecker and Ms. Galizia further advised MS. SCOTT in this conversation that she also would no longer be receiving incentive compensation on any renewals of business she had brought in up to that point. Both of these changes were directly contrary to representations and assurances MS. SCOTT had been given when she was being recruited to leave her former employer and join the LIBERTY MUTUAL medical stop-loss sales team, and they reduced in a stroke MS. SCOTT's earning potential with LIBERTY MUTUAL by around 95%, except to whatever unknown extent she would be able to generate business from entirely new sources. The cancellation of MS. SCOTT's right to receive compensation from renewals even squarely contradicted what she had been told by Ms. Galizia herself on August 20, 2019 (see ¶ 47, *supra*).

26
27
28

56.     Also during the September 17, 2019 conference call, Ms. Galizia informed MS. SCOTT that she (Ms. Galizia) would be taking over the management of the account

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

with Stealth Partner Group, MS. SCOTT's largest (by sales volume) client, thus elbowing MS. SCOTT out of a client relationship she had spent years cultivating, both before and after she had joined LIBERTY MUTUAL, and through which she had been able to produce $25 million in sales during her first year with LIBERTY MUTUAL.

57.    Upon information and belief, none of the male medical stop-loss sales representatives and those both male and younger, and who had reported no instances of sexual harassment, had their accounts taken over by Ms. Galizia or any other representative of LIBERTY MUTUAL's medical stop-loss sales management.

58.    While the decision of Ms. Dornecker and Ms. Galizia not to pay commissions on sales to broker panels or general agents was apparently applied to other LIBERTY MUTUAL medical stop-loss sales representatives, and perhaps the decision to no longer pay commissions on renewals as well, the financial effects of these decisions fell disproportionately on MS. SCOTT, the lone female sales representative, who was over 40 and had had the temerity to report an incident of sexual harassment, simply because her sales volume, and the commission income she derived from those sales, so far exceeded that of all the other sales representatives combined (see ¶¶ 26-27, *supra*).

59.    The end result of the various machinations by Ms. Galizia and Ms. Dornecker as hereinbefore alleged was to reduce MS. SCOTT's income potential in 2020 and future years to no more than a very small fraction of the earning potential by which she had been induced to join LIBERTY MUTUAL and what she had actually been able to earn in 2018 and 2019.  While these developments may also have reduced the income potential of male sales representatives and those male and younger than MS. SCOTT, and

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

who had made no reports of unlawful sexual harassment, the reduction – both in dollar and percentage terms – was far greater for MS. SCOTT than it was for such other employees because the sales she had generated, and the commissions she had earned from those sales, were five times those of the male sales representatives with the next highest sales total in the same period.

60.    On September 23, 2019, Ms. Galizia sent to MS. SCOTT a "One Time Final Warning" ("Warning"),  stating that MS. SCOTT had violated LIBERTY MUTUAL policies by using her personal credit card for business expenses, not providing adequate documentation for her expenses, not adequately itemizing receipts for expenses of $25.00 or more, not reporting expenses within 30 days of incurring them, submitting business entertainment expenses that had not previously been approved by management, and submitting business entertainment expenses exceeding nominal amounts.  By its terms, the Warning was to be made part of MS. SCOTT's personnel file, was to be reflected in her final performance review, was to be considered in determining her overall performance rating, was to preclude her from attending any Field Recognition Programs for a year or more, and was to preclude her from participating in the next Liberty Elite Trip (a benefit recognizing top performers).  MS. SCOTT sent an email to Ms. Galizia disputing the factual accuracy and characterizations of key portions of the Warning, and protesting that it was neither fair nor reasonable under the actual circumstances.  Upon information and belief, none of LIBERTY MUTUAL's male sales representatives, or those younger than MS. SCOTT, were given a "One Time Final Warning," or were

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

subjected to similarly harsh treatment because of comparable problems identified with their handling of their business expenses.

61.    In late September of 2019, MS. SCOTT was told by one of LIBERTY MUTUAL's male medical stop-loss sales representatives, who had no prior experience in sales management, that he had been selected to head up sales some months earlier.  This sales management position was never posted as required by LIBERTY MUTUAL policy.  Despite having extensive sales management experience in her career before joining LIBERTY MUTUAL, MS. SCOTT was never informed that the job was available, and she was given no opportunity to compete for it.

62.    On October 8, 2019, MS. SCOTT received a telephone call from Ms. Galizia in which she was told that Ms. Galizia wanted her thenceforth to provide *prospective* activity schedules, as opposed to the weekly call reports she had been required by Ms. Galizia to submit for the past month (see ¶ 51, *supra*), so that Ms. Galizia would know in advance what MS. SCOTT would be doing.  Upon information and belief, other LIBERTY MUTUAL medical stop-loss sales representatives, who were male and those both male and younger than MS. SCOTT and who had not reported any incidents of sexual harassment, were not required to submit similar information.  Also in this conversation, Ms. Galizia brought up the subject of MS. SCOTT's email challenging and protesting the written Warning she had been given on September 23, 2019 (see ¶ 60, *supra*).  Rather than providing any substantive response to points MS. SCOTT had raised in her email protesting the Warning, Ms. Galizia dismissed MS. SCOTT's protest by

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

saying she did not know what to say, but that the Warning would be neither withdrawn nor modified.

63.    All of MS. SCOTT's requests in September and October of 2019 that she be allowed to attend conferences rich with business development opportunities were denied by Ms. Galizia, while, upon information and belief, other LIBERTY MUTUAL medical stop-loss sales representatives who were male and those both male and younger than MS. SCOTT and who had reported no incidents of sexual harassment were permitted, indeed invited by Ms. Galizia, to attend such conferences.

64.    In mid-October of 2019, Ms. Galizia convened a meeting of LIBERTY MUTUAL's medical stop-loss sales representatives that she knew MS. SCOTT would be unable to attend due to a previously scheduled meeting with a client, pursuing the very new business relationships Ms. Galizia had directed her to pursue.  At the meeting of LIBERTY MUTUAL's sales representatives (minus MS. SCOTT), Ms. Galizia announced that she was seeking to fill the position of Manager of Medical Stop Loss Sales, a position for which she knew MS. SCOTT was imminently qualified by reason of her prior experience in such a position with a prior employer.  When MS. SCOTT asked Ms. Galizia, shortly after the meeting, what she had missed by having been unable to attend the meeting of the medical stop-loss sales representatives, Ms. Galizia gave only a cryptic response, making no mention of the announcement that she was seeking to fill the position of Manager of Medical Stop Loss Sales.  When MS. SCOTT learned of the opening in November, she immediately asked Ms. Galizia about it.  Galizia responded to MS. SCOTT's inquiry curtly, stating that MS. SCOTT would have known about the

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

opening if she had attended the October meeting of the stop-loss sales representatives, and that MS. SCOTT was no longer eligible to apply for the position because the posting had been closed.

65.     On November 1, 2019, Ms. Dornecker directed MS. SCOTT to discontinue any business travel until she had addressed Ms. Galizia's demands that MS. SCOTT provide a "substantive business plan," provide "regular field activity updates," and had "reconcile[ed]" her expense reports.   Prior to receiving this direction from Ms. Dornecker, MS. SCOTT had already submitted a business plan to Ms. Galizia, and had been providing field activity updates to Ms. Galizia since having been directed to do so almost two months earlier (see ¶ 51, *supra*) until Ms. Galizia changed the direction to require prospective activity reports instead (see ¶ 62, *supra*).   With regard to expense reports, MS. SCOTT had already submitted to Ms. Galizia all expense reports that were then due, though she continued to be at sea as to what was expected of her in important respects due to a lack of clarity in Ms. Galizia's criticisms of her expense reports, Ms. Galizia's continuing refusal to answer questions seeking clarification, and her failure or refusal to allow MS. SCOTT to get into contact with a knowledgeable auditor who might have been able to help her understand what was expected of her with respect to her expense reports.   In this period, Ms. Galizia had also begun informing MS. SCOTT that she was disallowing reimbursement for some expenses that MS. SCOTT's supervisor had previously approved.

66.     On November 15, 2019, MS. SCOTT filed Charge No. 523-2020-00266 with the United States Equal Employment Opportunity Commission ("EECO"), alleging

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

unlawful retaliation and sex discrimination.  A copy of said charge is attached to this Complaint as **Exhibit "A."**  At the time, she filed her EEOC Charge, MS. SCOTT also filed with the EEOC an eight-page supplement to the Charge providing details of the retaliation and discrimination, on the basis of both sex and age, to which she had been subjected by LIBERTY MUTUAL.  A copy of that supplement to MS. SCOTT's EEOC Charge is attached hereto as **Exhibit "B."**

67.    When MS. SCOTT filed her EEOC Charge, the EEOC's Intake Officer neglected to note on the Charge that MS. SCOTT was seeking redress for age discrimination, in addition to retaliation and sex discrimination.    To remedy this omission, MS. SCOTT filed an amended CHARGE with the EEOC on May 29, 2020.  A copy of MS. SCOTT's amended EEOC Charge is attached hereto as **Exhibit "C."**

68.    On November 22, 2019, Ms. Galizia asked Andrew Trupiano, LIBERTY MUTUAL's Vice President of Medical Stop Loss Underwriting ("Mr. Trupiano"), to provide her with information on any firm offers that were then outstanding where MS. SCOTT was the sales representative.  Mr. Trupiano asked Ms. Galizia whether she wanted similar information on outstanding firm stop loss insurance coverage offers on sales generated by any other LIBERTY MUTUAL sales representatives (all of whom were male, all but one of whom was younger than MS. SCOTT, and none of whom had had the temerity to report any incidents of sexual harassment), and Ms. Galizia replied in the negative, saying that she was only interested in looking at firm offers on sales generated by MS. SCOTT.

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

69.    In response to Ms. Galizia's request, Mr. Trupiano provided her with information on a firm offer that had been made to St. Rose Hospital through Alliant Insurance Services, a non-general agent MS. SCOTT had been working hard to develop in the wake of Ms. Galizia's and Ms. Dornecker's having informed her that she would no longer be receiving commissions on any sales generated through general agents and broker panels (see ¶ 55, *supra*), and that she needed to focus on developing business with new sources.

70.    After receiving information on the St. Rose Hospital firm offer from Mr. Trupiano, Ms. Galizia directed him to "pull" (i.e., withdraw) the offer.  In the medical stop loss insurance industry, the withdrawal of a firm offer, once made, is truly extraordinary because doing so is virtually guaranteed to alienate the agent and client directly affected, but it also carries a very high risk of undermining the credibility of the party withdrawing the offer throughout the industry because prospective clients can no longer assume that a "firm" offer will, in fact, be honored.

71.    The reason Ms. Galizia gave for directing that the firm offer to St. Rose Hospital be withdrawn was that she was sure the business would be unprofitable, regardless of the fact that the offer had been made in accordance with all applicable underwriting guidelines.  The offer was withdrawn without MS. SCOTT's knowledge pursuant to Ms. Galizia's direction and at considerable cost to the credibility of both MS. SCOTT and LIBERTY MUTUAL in the marketplace.

72.    On January 22, 2020, MS. SCOTT's legal counsel sent, with her authorization, a letter via email and Federal Express to James F. Kelleher, LIBERTY

**WALKER & PESKIND, PLLC**
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

MUTUAL's Executive Vice President & Chief Legal Officer, providing a copy of MS. SCOTT's original EEOC charge, along with a detailed account (with relevant enclosures) of the unlawful retaliation and discriminatory treatment to which she had been subjected. A copy of that letter (without enclosures) is attached hereto as **Exhibit "D."**

73. On January 23, 2020, LIBERTY MUTUAL filed its Position Statement with the EEOC responding to MS. SCOTT's EEOC Charge.

74. On January 28, 2020, Ms. Galizia delivered MS. SCOTT's Performance Review to her via telephone conference. The written evaluation gave MS. SCOTT a transparently retaliatory rating of 5 out of a possible 15, making no mention of MS. SCOTT's generation of $27 million in sales during the year, an amount that surpassed, by an order of magnitude, the combined sales results in the same period of all the remaining LIBERTY MUTUAL stop-loss sales representatives (all of whom were male and most of whom were both male and younger than MS. SCOTT, and none of whom had reported incidents of sexual harassment) combined. A copy of the written Performance and Talent Review Summary provided to MS. SCOTT on January 28, 2020 is attached hereto as **Exhibit "E."**

75. During their conference call regarding MS. SCOTT's performance review on January 28, 2020, Ms. Galizia provided little explanation for the abysmal rating she had given MS. SCOTT beyond the flat statement in the written review that MS. SCOTT "did not meet the standards and expectations for your role." It was apparent to MS. SCOTT during this conversation that Ms. Galizia was attributing to MS. SCOTT responsibility for factors over which MS. SCOTT had no control, or for things based on

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

wholly fictitious allegations.  At the conclusion of this conference call, Ms. Galizia bluntly asked MS. SCOTT why, in light of her "meager" compensation prospects, she was even staying around.  MS. SCOTT replied that she was not a quitter, that she had been resolved when she joined LIBERTY MUTUAL that it would be her last company, and that she still hoped, despite everything, that she could find a way to a successful and remunerative career at LIBERTY MUTUAL.  MS. SCOTT then asked Ms. Galizia if she wanted MS. SCOTT to leave LIBERTY MUTUAL's employ.  Ms. Galizia replied that there was "a lot going on," and that she did not want to answer the question.

76.     In March of 2020, Ms. Galizia announced out of the blue that Karthik Mohan ("Mr. Mohan") had been hired to fill the Manager of Medical Stop Loss Sales position for which she had announced an opening in the mid-October meeting of LIBERTY MUTUAL's medical stop-loss sales representatives that MS. SCOTT had been unable to attend (see ¶ 64, *supra*).   Mr. Mohan is a male hired from outside LIBERTY MUTUAL who is, upon information and belief, younger than MS. SCOTT. Mr. Mohan was hired by LIBERTY MUTUAL for his management position over medical stop-loss sales without any prior sales management experience, without any experience in the medical stop-loss sales industry and little, if any, knowledge of the industry and the markets served by medical stop-loss sales representatives.

77.     Despite MS. SCOTT's extensive prior experience in medical stop loss sales management, she was not given an opportunity to compete for the management position filled by Mr. Mohan, and the opening was not posted as required by LIBERTY MUTUAL's internal policies.

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

78.    In May of 2020, Ms. Galizia left LIBERTY MUTUAL's employ.

79.    For several months after Mr. Mohan was installed in the management position to which MS. SCOTT was required to report, she worked with him to educate him on stop-loss basics, how brokers in the medical stop-loss industry work, market conditions in the industry, etc., all subjects on which Mr. Mohan repeatedly demonstrated he was all but completely uninformed, in some instances embarrassingly so.    MS. SCOTT worked to help Mr. Mohan overcome his knowledge deficits willingly in the hope that doing so would provide the foundation for a good working relationship that would be mutually beneficial for Mr. Mohan, MS. SCOTT, and LIBERTY MUTUAL.

80.    As time passed after Mr. Mohan's arrival, however, it became increasingly clear that no one at LIBERTY MUTUAL, including Mr. Mohan, had any intention of taking seriously MS. SCOTT's complaints about how she had been treated, and it was apparent that nothing was being done to address the wrongful conduct to which she had been subjected.

81.    After LIBERTY MUTUAL's Chief Legal Officer was notified by MS. SCOTT's legal counsel about the unfair, unjust, and unlawful treatment to which she had been subjected, no one from LIBERTY MUTUAL's Human Resources or Legal Departments ever contacted MS. SCOTT to discuss her issues and concerns, nothing was done to restore to her any portion of the opportunities to earn the non-salary incentive compensation that had been used to lure her to LIBERTY MUTUAL in the first place, and *all* of her business expenses, including those that had been expressly approved by supervision, remained unreimbursed.

30

82. For his part, Mr. Mohan continued to exclude MS. SCOTT from contacts with clients Ms. Galizia had taken from her, despite the many years MS. SCOTT had invested in cultivating relationships with those clients. These were the same clients from whom Ms. Galizia had told MS. SCOTT at one point LIBERTY MUTUAL would no longer be seeking business, but whose business Mr. Mohan and others in LIBERTY MUTUAL were, and on information and belief still are, actively pursuing.

83. On July 22, 2020, LIBERTY MUTUAL's legal counsel filed with the EEOC a supplement to the position statement filed on January 23, 2020 (see ¶ 73, *supra*). In its supplemental filing, LIBERTY MUTUAL falsely claimed that MS. SCOTT had been presented with her performance evaluation on or about February 11, 2020, when her evaluation had in fact been presented to her on January 28, 2020 (see ¶ 74, *supra*). Worse, LIBERTY MUTUAL's supplement attached a copy of a fabricated evaluation, never given to MS. SCOTT, that apparently had been prepared a day after MS. SCOTT's counsel had written to in-house counsel complaining about the retaliatory evaluation Ms. Galizia had presented to MS. SCOTT on January 28, 2020. In LIBERTY MUTUAL's supplemental filing, its counsel quoted from the fabricated evaluation and falsely claimed that, when it had been given to her, "her manager explained therein the rationale for the numerical ratings." The submission of this fabricated evidence and the representations made about it in LIBERTY MUTUAL's supplemental filing with the EEOC violated 18 U.S.C. § 1001, which makes it a federal criminal offense to "make[] any materially false, fictitious, or fraudulent statement or representation" to a federal agency, or to "make[] or use[] any false writing or document knowing the same to contain any materially false,

31

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

fictitious, or fraudulent statement or entry" with respect to a matter within the jurisdiction of a federal agency.

84.     Finally, after waiting months for some indication that LIBERTY MUTUAL would recognize and acknowledge that MS. SCOTT had been wronged and take concrete steps to provide at least partial redress for those wrongs, MS. SCOTT was forced to accept the reality that any hope for a meaningful career at LIBERTY MUTUAL had been extinguished by Ms. Galizia and Ms. Dornecker, and that LIBERTY MUTUAL management had no intention of doing anything to rectify the situation.  This conclusion was reinforced by the revelation in LIBERTY MUTUAL's July 22, 2020 supplement to its position statement filed with the EEOC that the company's management was so resolute in its zeal to counter her claims that it was even willing to fabricate evidence and risk criminal prosecution by inducing its legal counsel to submit material false statements to an agency of the federal government.

85.     On October 2, 2020, MS. SCOTT sent an email to Mr. Mohan informing him that she felt any reasonable person in her situation would find the conditions in which she was working to be so intolerable he or she would have no choice but to resign. Accordingly, MS. SCOTT informed Mr. Mohan in this email, that she considered herself to have been constructively discharged by LIBERTY MUTUAL.  MS. SCOTT has never received a response to this constructive discharge notice, and no one in LIBERTY MUTUAL has ever suggested that her description of the circumstances precipitating the notice was in any respect inaccurate.

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

86.    Commissions earned by MS. SCOTT pursuant to the terms of the TRU Executive Compensation Plan agreed upon at the commencement of her employment with Liberty Mutual remain unpaid, and her business expenses, including those never challenged and approved by Ms. Galizia or other representatives of LIBERTY MUTUAL management, have never been reimbursed.

## IV.  FIRST CLAIM

### (Retaliation in Violation of Title VII of the Civil Rights Act of 1964)

87.    Plaintiff incorporates, as if specifically re-alleged herein, all allegations set forth above in Paragraphs 1 through 86 of this her Complaint.

88.    Section 704(a) of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-3(a) provides, in pertinent part, as follows:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in and investigation, proceeding, or hearing under this subchapter.

89.    By reporting the sexual harassment to which she had been subjected by a male fellow LIBERTY MUTUAL employee in late March of 2019 (see ¶¶ 28-31, *supra*), MS. SCOTT engaged in activity protected under Section 704(a) of Title VII.

90.    By filing with the EEOC Charge No.  523-2020-00266 on November 15, 2019, along with her supplement thereto (see ¶ 66, *supra*, and **Exhibits "A"** and **"B"** hereto) and her subsequent amendment to said Charge on May 29, 2020 (see ¶ 67, *supra*,

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

and **Exhibit "C"** hereto), MS. SCOTT engaged in activity protected under Section 704(a) of Title VII.

91.    By providing notice to LIBERTY MUTUAL's Chief Legal Officer of the discriminatory and retaliatory treatment to which she had been subjected (see ¶ 72, *supra*, and **Exhibit "D"** hereto), MS. SCOTT engaged in activity protected under Section 704(a) of Title VII.

92.    The thoroughgoing campaign of harassment, degradation, humiliation, discriminatory treatment, and other forms of abuse whereby MS. SCOTT's career prospects and earning potential at LIBERTY MUTUAL were systematically destroyed and her stature with both other LIBERTY MUTUAL employees and clients outside LIBERTY MUTUAL was undermined by Ms. Galizia and Ms. Dornecker (see ¶¶ 32-65, 68-71, 74-77, *supra*), with further subsequent contributions by Mr. Mohan after Ms. Galizia's departure from LIBERTY MUTUAL's employ (see ¶¶ 79-80, 82, *supra*), all of which created a hostile and intolerable work environment, were the direct result of animosities spawned by MS. SCOTT's having reported the aforementioned sexual harassment, and/or by her having filed her charge with the EEOC and having informed LIBERTY MUTUAL's Chief Legal Officer of her complaints, and were calculated to, and ultimately did, make it impossible for her to continue her career with LIBERTY MUTUAL.

93.    But for MS. SCOTT's having engaged in the protected activity of reporting internally the sexual harassment and discriminatory treatment to which she had been subjected, and her having engaged in the protected activity of reporting such unlawful

conduct to the EEOC, most or all of the incidents comprising the relentless and systematic campaign of retaliation and discriminatory treatment designed to make it impossible for her to continue her employment with LIBERTY MUTUAL's would not have occurred.

94.     The delivery of MS. SCOTT's transparently negative and wholly unjustified performance review by Ms. Galizia on January 28, 2020 (see ¶¶ 74-75, *supra*, and **Exhibit "E"** hereto), a mere six days after LIBERTY MUTUAL's Chief Legal Officer had been put on notice of the details of the unlawful retaliatory and discriminatory conduct to which MS. SCOTT had been subjected and the day immediately following LIBERTY MUTUAL's filing of its position statement responding to MS. SCOTT's EEOC Charge (see ¶¶ 72-74, *supra*, and **Exhibit "E"** hereto), was a direct result of MS. SCOTT's having reported the sexual harassment and discriminatory treatment to which she had been subjected and/or her filing of her EEOC Charge and/or her attorney's having reported to LIBERTY MUTUAL's Chief Legal Officer the details of such unlawful treatment.   Neither the negative review nor Ms. Galizia's effective invitation for MS. SCOTT to leave LIBERTY MUTUAL's employ during their conversation discussing the performance review would have occurred but for MS. SCOTT's having engaged in protected activity as hereinbefore alleged.

95.     So intent were Ms. Galizia and Ms. Dornecker on retaliating against MS. SCOTT for having reported the sexual harassment to which she had been subjected, for having filed her EEOC Charge, and for having reported complaints about her treatment to LIBERTY MUTUAL's Chief Legal Officer, that they made and implemented decisions

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

manifestly contrary to LIBERTY MUTUAL's own best business interests, impeding if not destroying altogether LIBERTY MUTUAL's ability to realize a respectable return on its 2017 investments in the acquisitions of Ironshore and TRU (see ¶¶ 15-18, *supra*).

96.     LIBERTY MUTUAL acted and failed to act in willful, malicious, and intentional violation and/or in reckless disregard of MS. SCOTT's federally protected rights under Section 704(a) of Title VII.

97.     As a result of Defendant LIBERTY MUTUAL's retaliatory acts and omissions as hereinbefore alleged, MS. SCOTT has in the past and will in the future suffer injuries and damages, including but not limited to loss of employment, impairment of her demonstrated ability to produce extraordinary sales results and earn substantial incentive compensation thereby, violation of her contractual rights, mental and emotional distress, humiliation, intimidation, embarrassment, loss of income and benefits, loss of stature in the medical stop-loss sales industry, loss of future earnings, and loss of other emoluments of employment.

98.     As a result of the willful, malicious, and intentional retaliatory acts suffered by MS. SCOTT in violation of Section 704(a) of Title VII, she is entitled, pursuant to Section 706g of Title VII, 42 U.S.C. § 2000e-5(g), and 42 U.S.C. § 1981a, to an award of backpay and front pay in an amount to be shown at trial in this matter, compensatory damages, punitive damages, attorney's fees, and the costs of litigation.

## V.    SECOND CLAIM

**(Sex Discrimination in Violation of Title VII**

36

**of the Civil Rights Act of 1964)**

99.   Plaintiff incorporates, as if specifically re-alleged herein, all allegations set forth above in Paragraphs 1 through 98 of this her Complaint.

100.   Section 703 Title VII of the Civil Rights Act of 1964 makes it an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1).

101.   In their lengthy, relentless, and malicious campaign to drive MS. SCOTT out of LIBERTY MUTUAL, Ms. Galizia and Ms. Dornecker repeatedly imposed on MS. SCOTT terms and conditions of employment to which male LIBERTY MUTUAL medical stop-loss sales representatives were not made subject, or otherwise discriminated against MS. SCOTT on the basis of her sex.  This discriminatory treatment included, but was not limited to: (1) inviting male sales representatives to attend meetings with MS. SCOTT's clients while excluding MS. SCOTT from such meetings (see ¶ 39, *supra*); (2) changing underwriting guidelines for MS. SCOTT's clients without informing her, but not those of male sales representatives, in such a manner as to create substantial disincentives for MS. SCOTT's clients to purchase LIBERTY MUTUAL medical stop-loss insurance products and thereby diminishing MS. SCOTT's ability to make sales to such clients from which she could have earned incentive compensation (see ¶ 42, *supra*); (3) announcing to male medical stop-loss employees that LIBERTY MUTUAL medical

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

37

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

stop loss sales for 2020 were to be capped at $10 million, without informing MS. SCOTT (see ¶ 43, *supra*); (4) seeking to undermine MS. SCOTT with her coworkers by demanding that Ms. Galizia was to be copied on all communications with MS. SCOTT, and Ms. Galizia's letting it be known among the LIBERTY MUTUAL sales personnel by asking questions and making disparaging comments about MS. SCOTT that she was *persona non grata* from Ms. Galizia's perspective, while MS. SCOTT's male counterparts were not subjected to such subversive conduct (see ¶ 44, *supra*); (5) seeking to undermine MS. SCOTT with clients she had developed and with whom she had long-standing relationships by not inviting her to attend meetings with those clients (see ¶¶ 45, 48, 52 *supra*) while not placing similar impediments to successful client relationships and sales with respect to male sales representatives; (6) fly-specking MS. SCOTT's expense reports, unfairly criticizing them, rudely refusing MS. SCOTT's entreaties that she provide guidance or access to guidance, imposing patently unfair and unreasonable administrative requirements pertaining thereto, and withholding reimbursement of all her business expenses regardless of whether they had previously been approved by management and had never been challenged, all in a manner to which male sales representatives were not subjected with respect to their expense reports (see ¶¶ 46, 49, 53, 65, *supra*); (7) imposing substantially higher renewal premium rates on MS. SCOTT's clients than those imposed on the clients of male sales representatives, thus making it less likely that MS. SCOTT's clients would renew their coverages with LIBERTY MUTUAL and diminishing the chances MS. SCOTT would receive incentive compensation she otherwise would have received for such renewals (see ¶¶ 47-48, *supra*); (8) imposing on

MS. SCOTT administrative requirements and burdens that were either not imposed on male sales representatives at all, or that were applied to the male employees much more leniently (see ¶¶ 50-51, 62, *supra*); (9) announcing a decision that LIBERTY MUTUAL would no longer be quoting business with "the BUCAs" (Blue Cross, United Healthcare, Cigna, and Aetna) with Stealth Partner Group, MS. SCOTT's largest (by sales volume) client, again with no advance notice to MS. SCOTT, while that limitation was not applied to the clients of male sales representatives (see ¶ 54, *supra*); (10) announcing to MS. SCOTT that LIBERTY MUTUAL would no longer pay incentive compensation on business with broker panels or general agents, which at the time comprised 100% of MS. SCOTT's client portfolio, and that LIBERTY MUTUAL would no longer honor its obligation to pay incentive compensation on renewals by MS. SCOTT's clients (see ¶ 55, *supra*); (11) taking over management of the account of Stealth Partner Group, MS. SCOTT's largest (by sales volume) client, and elbowing her out of a client relationship she had spent years cultivating, when male sales representatives were not subjected to similar treatment (see ¶¶ 56-58, *supra*); (12) imposing discipline in the form of a "One Time Final Warning" with regard to issues with MS. SCOTT's expense reports that was manifestly unfair and unreasonable, thus foreclosing her access to certain employment benefits to which she otherwise would have been entitled, while similarly situated male employees were either not disciplined at all or received disciplinary action that was considerably less harsh (see ¶¶ 60, 62, *supra*); (13) hiring of less qualified males for sales management positions for which MS. SCOTT was imminently qualified, but for which she was not even given the opportunity to compete (see ¶¶ 61, 64, 76-77, *supra*); (14)

requiring MS. SCOTT to submit weekly call reports, and later to submit prospective activity schedules, when male sales representatives were not similarly burdened with such requirements (see ¶ 62, *supra*); (15) repeatedly refusing to authorize MS. SCOTT to attend conferences that were rich with business development opportunities, while male employees were permitted and even encouraged to attend such conferences (see ¶ 63, *supra*); and (16) providing MS. SCOTT with a performance rating that failed to recognize her considerable accomplishments and was transparently retaliatory, with essentially no explanation or attempt to justify the rating, when male sales representatives whose performances paled by comparison to MS. SCOTT's were not given such unfavorable ratings (see ¶¶ 74-75, *supra*).

102.    The lengthy, relentless, and malicious campaign to drive MS. SCOTT out of LIBERTY MUTUAL commenced by Ms. Galizia and Ms. Dornecker, continued over many months, and LIBERTY MUTUAL took no action to address in any meaningful way the abuses to which MS. SCOTT had been subjected after those abuses were brought to the attention in detail to LIBERTY MUTUAL's Chief Legal Officer in January 2020. This left MS. SCOTT with no clear career path within LIBERTY MUTUAL, only drastically reduced prospects for earning an income even approaching that she had enjoyed before coming to LIBERTY MUTUAL and far below what had been held out as a major incentive while she was being recruited to join the company.  Consequently, after several months with no indication from LIBERTY MUTUAL that anything would ever be done to rectify or even ameliorate the wrongs she had suffered, MS. SCOTT's working conditions became intolerable to her, as they would have done for any

40

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

reasonable person in her position (see ¶¶ 74-77 and 79-86, *supra*).  As a result, she was constructively discharged by LIBERTY MUTUAL in violation of Section 703 of Title VII as of October 2, 2020.

103.    Each and every one of the instances of discriminatory treatment summarized above in Paragraphs 101 and 102 violated the proscription against discrimination on the basis of sex set forth in Section 703(a)(1) of Title VII and, taken together, they constitute a continuing pattern of intentional discriminatory acts, for which there was no legitimate nondiscriminatory justification, that were engaged in intentionally and with malice or in reckless disregard for MS. SCOTT's federally protected rights under Section 703(a)(1) of Title VII.

104.    As a result of the willful, malicious, and intentional discrimination on the basis of her sex suffered by MS. SCOTT, she is entitled, pursuant to Section 706g of Title VII, 42 U.S.C. § 2000e-5(g), and 42 U.S.C. § 1981a, to an award of backpay and front pay in an amount to be shown at trial in this matter, compensatory damages, punitive damages, attorney's fees, and the costs of litigation.

## VI.    THIRD CLAIM

### (Discrimination in Violation of the Age Discrimination in Employment Act)

105.    Plaintiff incorporates, as if specifically re-alleged herein, all allegations set forth above in Paragraphs 1 through 104 of this her Complaint.

106.    The Age Discrimination in Employment Act ("ADEA"), in pertinent part, makes it unlawful for employers:

41

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

(1) to . . . discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's age;

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age . . . .

29 U.S.C. § 623(a)(1) and (2).

107.    MS. SCOTT is, and has been at all times pertinent, over the age of 40 years.

108.    During the events described in this Complaint, all LIBERTY MUTUAL medical stop loss sales representatives, save only MS. SCOTT and one other individual, were under the age of 40 years and, upon information and belief, substantially younger than MS. SCOTT.

109.    In their lengthy, relentless, and malicious campaign to drive MS. SCOTT out of LIBERTY MUTUAL, Ms. Galizia and Ms. Dornecker repeatedly imposed on MS. SCOTT terms and conditions of employment to which other LIBERTY MUTUAL medical stop-loss sales representatives who were younger than MS. SCOTT were not made subject, or otherwise discriminated against MS. SCOTT on the basis of her age. This discriminatory treatment included, but was not limited to: (1) inviting younger sales representatives to attend meetings with MS. SCOTT's clients while excluding MS. SCOTT from such meetings (see ¶ 39, *supra*); (2) changing underwriting guidelines for MS. SCOTT's clients without informing her, but not those of younger sales representatives, in such a manner as to create substantial disincentives for MS. SCOTT's clients to purchase LIBERTY MUTUAL medical stop-loss insurance products and

42

thereby diminishing MS. SCOTT's ability to make sales to such clients from which she could have earned incentive compensation (see ¶ 42, *supra*); (3) announcing to younger medical stop-loss employees that LIBERTY MUTUAL medical stop loss sales for 2020 were to be capped at $10 million, without informing MS. SCOTT (see ¶ 43, *supra*); (4) seeking to undermine MS. SCOTT with her coworkers by demanding that Ms. Galizia was to be copied on all communications with MS. SCOTT, and Ms. Galizia's letting it be known among the LIBERTY MUTUAL sales personnel by asking questions and making disparaging comments about MS. SCOTT that she was *persona non grata* from Ms. Galizia's perspective, while MS. SCOTT's younger counterparts were not subjected to such subversive conduct (see ¶ 44, *supra*); (5) seeking to undermine MS. SCOTT with clients she had developed and with whom she had long-standing relationships by not inviting her to attend meetings with those clients (see ¶¶ 45, 48, 52 *supra*) while not placing similar impediments to successful client relationships and sales with respect to younger sales representatives; (6) fly-specking MS. SCOTT's expense reports, unfairly criticizing them, rudely refusing MS. SCOTT's entreaties that she provide guidance or access to guidance, imposing patently unfair and unreasonable administrative requirements pertaining thereto, and withholding reimbursement of all her business expenses regardless of whether they had previously been approved by management and had never been challenged, all in a manner to which younger sales representatives were not subjected with respect to their expense reports (see ¶¶ 46, 49, 53, 65, *supra*); (7) imposing substantially higher renewal premium rates on MS. SCOTT's clients than those imposed on the clients of younger sales representatives, thus making it less likely that

43

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

MS. SCOTT's clients would renew their coverages with LIBERTY MUTUAL and diminishing the chances MS. SCOTT would receive incentive compensation she otherwise would have received for such renewals (see ¶¶ 47-48, *supra*); (8) imposing on MS. SCOTT administrative requirements and burdens that were either not imposed on younger sales representatives at all, or that were applied to the male employees much more leniently (see ¶¶ 50-51, 62, *supra*); (9) announcing a decision that LIBERTY MUTUAL would no longer be quoting business with "the BUCAs" (Blue Cross, United Healthcare, Cigna, and Aetna) with Stealth Partner Group, MS. SCOTT's largest (by sales volume) client, again with no advance notice to MS. SCOTT, while that limitation was not applied to the clients of younger sales representatives (see ¶ 54, *supra*); (10) announcing to MS. SCOTT that LIBERTY MUTUAL would no longer pay incentive compensation on business with broker panels or general agents, which at the time comprised 100% of MS. SCOTT's client portfolio, and that LIBERTY MUTUAL would no longer honor its obligation to pay incentive compensation on renewals by MS. SCOTT's clients (see ¶ 55, *supra*); (11) taking over management of the account of Stealth Partner Group, MS. SCOTT's largest (by sales volume) client, and elbowing her out of a client relationship she had spent years cultivating, when younger sales representatives were not subjected to similar treatment (see ¶¶ 56-58, *supra*); (12) imposing discipline in the form of a "One Time Final Warning" with regard to issues with MS. SCOTT's expense reports that was manifestly unfair and unreasonable, thus foreclosing her access to certain employment benefits to which she otherwise would have been entitled, while similarly situated younger employees were either not disciplined at

44

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

all or received disciplinary action that was considerably less harsh (see ¶¶ 60, 62, *supra*); (13) hiring of less qualified younger individuals for sales management positions for which MS. SCOTT was imminently qualified, but for which she was not even given the opportunity to compete (see ¶¶ 61, 64, 76-77, *supra*); (14) requiring MS. SCOTT to submit weekly call reports, and later to submit prospective activity schedules, when younger sales representatives were not similarly burdened with such requirements (see ¶ 62, *supra*); (15) repeatedly refusing to authorize MS. SCOTT to attend conferences that were rich with business development opportunities, while younger employees were permitted and even encouraged to attend such conferences (see ¶ 63, *supra*); and (16) providing MS. SCOTT with a performance rating that failed to recognize her considerable accomplishments and was transparently retaliatory, with essentially no explanation or attempt to justify the rating, when younger sales representatives whose performances paled by comparison to MS. SCOTT's were not given such unfavorable ratings (see ¶¶ 74-75, *supra*).

110.    The lengthy, relentless, and malicious campaign to drive MS. SCOTT out of LIBERTY MUTUAL commenced by Ms. Galizia and Ms. Dornecker, continued over many months, and LIBERTY MUTUAL took no action to address in any meaningful way the abuses to which MS. SCOTT had been subjected after those abuses were brought to the attention in detail to LIBERTY MUTUAL's Chief Legal Officer in January 2020. This left MS. SCOTT with no clear career path within LIBERTY MUTUAL, only drastically reduced prospects for earning an income even approaching that she had enjoyed before coming to LIBERTY MUTUAL and far below what had been held out as

a major incentive while she was being recruited to join the company. Consequently, after several months with no indication from LIBERTY MUTUAL that anything would ever be done to rectify or even ameliorate the wrongs she had suffered, MS. SCOTT's working conditions became intolerable to her, as they would have done for any reasonable person in her position (see ¶¶ 74-77 and 79-86, *supra*). As a result, she was constructively discharged by LIBERTY MUTUAL in violation of the ADEA as of October 2, 2020.

111. Each and every one of the instances of discriminatory treatment summarized above in Paragraphs 109 and 110 violated the proscription against discrimination on the basis of age set forth in 29 U.S.C. § 623(a)(1) and (2) quoted in Paragraph 106, *supra*, and, taken together, they constitute a continuing course and pattern of willful and intentional discriminatory acts, for which there was no legitimate nondiscriminatory justification, that was inflicted upon MS. SCOTT with malice or in reckless disregard for MS. SCOTT's federally protected rights under the Age Discrimination in Employment Act.

112. As a result of the willful, intentional, and malicious discrimination on the basis of her age suffered by MS. SCOTT, she is entitled, pursuant to 29 U.S.C. §§ 216-217 and 626(b) and (c)(1), to reinstatement, an award of backpay and front pay in an amount to be shown at trial in this matter, liquidated damages, attorney's fees, and the costs of litigation.

## VII. <u>FOURTH CLAIM</u>

46

1
2

**(Retaliation in Violation of the
Age Discrimination in Employment Act)**

3    113.    Plaintiff incorporates, as if specifically re-alleged herein, all allegations set

4  forth above in Paragraphs 1 through 112 of this her Complaint.

5    114.    Pursuant to 29 U.S.C. § 623(d), it is unlawful for an employer to

6

7          . . . discriminate against any of his employees . . . because such
           individual . . . has opposed any practice made unlawful by [29
8          U.S.C. § 623], or because such individual . . . has made a charge,
           testified, assisted, or participated in any manner in an investigation,
9          proceeding, or litigation under [the ADEA].

10    115.    LIBERTY MUTUAL became aware of the fact that MS. SCOTT had filed

11

12  Charge No. 523-2020-0026 with the EEOC, alleging, *inter alia*, that she had been

13  discriminated against based on her age, no later than the receipt by its Executive Vice

14  President and Chief Legal Officer of the letter from MS. SCOTT's legal counsel on

15  January 22, 2020 (see ¶ 67, *supra*, and **Exhibit "D"** hereto).

16

17    116.    That LIBERTY MUTUAL was aware of MS. SCOTT's EEOC Charge by

18  mid- to late January 2020 is further confirmed by the fact that it filed its position

19  statement in response to the Charge on January 23, 2020.

20    117.    The manifestly retaliatory performance review delivered to MS. SCOTT

21

22  and discussed with her by Ms. Galizia on January 28, 2020 (see ¶¶ 74-75, *supra*, and

23  **Exhibit "E"** hereto), denial of the opportunity for MS. SCOTT to compete for senior

24  sales management jobs for which she was imminently qualified (see ¶¶ 61, 64, 76-77,

25  *supra*), the continued exclusion of MS. SCOTT from meetings with clients she had

26  developed by her new manager (see ¶ 79-80, *supra*), and the continued maintenance of

27

28
                                             47

**WALKER & PESKIND, PLLC**
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

hostile conditions making MS. SCOTT's continued employment with LIBERTY MUTUAL untenable, were all in retaliation, at least in part, for MS. SCOTT's having reported her allegations of age discrimination to the EEOC and her attorney's having raised these issues with LIBERTY MUTUAL's Chief Legal Officer.

118.    As a result of the retaliation against MS. SCOTT for having opposed LIBERTY MUTUAL's discrimination against her because of her age, and for having filed a Charge with the EEOC complaining of such discrimination, she is entitled to reinstatement, back pay and front pay in amounts to be established at trial, compensatory damages, liquidated damages, punitive damages, attorney's fees, and costs of litigation.

## VIII.  FIFTH CLAIM

### (Discrimination in Violation of the Washington Law Against Discrimination)

119.    Plaintiff incorporates, as if specifically re-alleged herein, all allegations set forth above in Paragraphs 1 through 118 of this her Complaint.

120.    The Washington Law Against Discrimination, in pertinent part, makes it an "unfair practice" for any employer:

> (2) To discharge . . . any person from employment because of age, sex . . . .
>
> (3) To discriminate against any person in compensation or in other terms or conditions of employment because of age, sex . . . .

RCW § 49.60.180(2) and (3).

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

48

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

121.    Further, the Washington Law Against Discrimination, in pertinent part, makes it an "unfair practice:"

> (1) For an employer . . . because an individual is forty years of age or older, . . . to terminate from employment such individual, or to discriminate against such individual in promotion, compensation or in terms, conditions or privileges of employment . . . .

RCW § 49.44.090(1).

122.    In their lengthy, relentless, and malicious campaign to drive MS. SCOTT out of LIBERTY MUTUAL, Ms. Galizia and Ms. Dornecker repeatedly imposed on MS. SCOTT terms and conditions of employment to which other LIBERTY MUTUAL medical stop-loss sales representatives who were male and/or younger than MS. SCOTT, and who had not had the temerity to report instances of sexual harassment, were not made subject, or otherwise discriminated against MS. SCOTT on the basis of her sex and/or age.  This discriminatory treatment included, but was not limited to: (1) inviting male and/or younger sales representatives to attend meetings with MS. SCOTT's clients while excluding MS. SCOTT from such meetings (see ¶ 39, *supra*); (2) changing underwriting guidelines for MS. SCOTT's clients without informing her, but not those of male and/or younger sales representatives, in such a manner as to create substantial disincentives for MS. SCOTT's clients to purchase LIBERTY MUTUAL medical stop-loss insurance products and thereby diminishing MS. SCOTT's ability to make sales to such clients from which she could have earned incentive compensation (see ¶ 42, *supra*); (3) announcing to male and/or younger medical stop-loss employees that LIBERTY MUTUAL medical stop loss sales for 2020 were to be capped at $10 million, without

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

informing MS. SCOTT (see ¶ 43, *supra*); (4) seeking to undermine MS. SCOTT with her coworkers by demanding that Ms. Galizia was to be copied on all communications with MS. SCOTT, and Ms. Galizia's letting it be known among the LIBERTY MUTUAL sales personnel by asking questions and making disparaging comments about MS. SCOTT that she was *persona non grata* from Ms. Galizia's perspective, while MS. SCOTT's male and/or younger counterparts were not subjected to such subversive conduct (see ¶ 44, *supra*); (5) seeking to undermine MS. SCOTT with clients she had developed and with whom she had long-standing relationships by not inviting her to attend meetings with those clients (see ¶¶ 45, 48, 52 *supra*) while not placing similar impediments to successful client relationships and sales with respect to male and/or younger sales representatives; (6) fly-specking MS. SCOTT's expense reports, unfairly criticizing them, rudely refusing MS. SCOTT's entreaties that she provide guidance or access to guidance, imposing patently unfair and unreasonable administrative requirements pertaining thereto, and withholding reimbursement of all her business expenses regardless of whether they had previously been approved by management and had never been challenged, all in a manner to which male and/or younger sales representatives were not subjected with respect to their expense reports (see ¶¶ 46, 49, 53, 65, *supra*); (7) imposing substantially higher renewal premium rates on MS. SCOTT's clients than those imposed on the clients of male and/or younger sales representatives, thus making it less likely that MS. SCOTT's clients would renew their coverages with LIBERTY MUTUAL and diminishing the chances MS. SCOTT would receive incentive compensation she otherwise would have received for such renewals (see ¶¶ 47-48,

50

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

1   *supra*); (8) imposing on MS. SCOTT administrative requirements and burdens that were

2   either not imposed on male and/or younger sales representatives at all, or that were

3   applied to the male and/or younger employees much more leniently (see ¶¶ 50-51, 62,

4   *supra*); (9) announcing a decision that LIBERTY MUTUAL would no longer be quoting

5   business with "the BUCAs" (Blue Cross, United Healthcare, Cigna, and Aetna) with

6   Stealth Partner Group, MS. SCOTT's largest (by sales volume) client, again with no

7   advance notice to MS. SCOTT, while that limitation was not applied to the clients of

8   male and/or younger sales representatives (see ¶ 54, *supra*); (10) announcing to MS.

9   SCOTT that LIBERTY MUTUAL would no longer pay incentive compensation on

10  business with broker panels or general agents, which at the time comprised 100% of MS.

11  SCOTT's client portfolio, and that LIBERTY MUTUAL would no longer honor its

12  obligation to pay incentive compensation on renewals by MS. SCOTT's clients (see ¶ 55,

13  *supra*); (11) taking over management of the account of Stealth Partner Group, MS.

14  SCOTT's largest (by sales volume) client, and elbowing her out of a client relationship

15  she had spent years cultivating, when male and/or younger sales representatives were not

16  subjected to similar treatment (see ¶¶ 56-58, *supra*); (12) imposing discipline in the form

17  of a "One Time Final Warning" with regard to issues with MS. SCOTT's expense reports

18  that was manifestly unfair and unreasonable, thus foreclosing her access to certain

19  employment benefits to which she otherwise would have been entitled, while similarly

20  situated male and/or younger employees were either not disciplined at all or received

21  disciplinary action that was considerably less harsh (see ¶¶ 60, 62, *supra*); (13) hiring of

22  less qualified male and/or younger individuals for sales management positions for which

23

24

25

26

27

28

51

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

MS. SCOTT was imminently qualified, but for which she was not even given the opportunity to compete (see ¶¶ 61, 64, 72-73, *supra*); (14) requiring MS. SCOTT to submit weekly call reports, and later to submit prospective activity schedules, when male and/or younger sales representatives were not similarly burdened with such requirements (see ¶ 62, *supra*); (15) repeatedly refusing to authorize MS. SCOTT to attend conferences that were rich with business development opportunities, while male and/or younger employees were permitted and even encouraged to attend such conferences (see ¶ 63, *supra*); and (16) providing MS. SCOTT with a performance rating that failed to recognize her considerable accomplishments and was transparently retaliatory, with essentially no explanation or attempt to justify the rating, when male and/or younger sales representatives whose performances paled by comparison to MS. SCOTT's were not given such unfavorable ratings (see ¶¶ 74-75, *supra*).

123.    The lengthy, relentless, and malicious campaign to drive MS. SCOTT out of LIBERTY MUTUAL commenced by Ms. Galizia and Ms. Dornecker, continued over many months, and LIBERTY MUTUAL took no action to address in any meaningful way the abuses to which MS. SCOTT had been subjected after those abuses were brought to the attention in detail to LIBERTY MUTUAL's Chief Legal Officer in January 2020. This left MS. SCOTT with no clear career path within LIBERTY MUTUAL, only drastically reduced prospects for earning an income even approaching that she had enjoyed before coming to LIBERTY MUTUAL and far below what had been held out as a major incentive while she was being recruited to join the company. Consequently, after several months with no indication from LIBERTY MUTUAL that anything would ever

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

be done to rectify or even ameliorate the wrongs she had suffered, MS. SCOTT's working conditions became intolerable to her, as they would have done for any reasonable person in her position (see ¶¶ 74-77 and 79-86, *supra*).  As a result, she was constructively discharged by LIBERTY MUTUAL in violation of the Washington Law Against Discrimination as of October 2, 2020.

124.    The cumulative effect of the multifarious forms of flagrantly harassing and discriminatory treatment described in Paragraphs 122 and 123, *supra*, was to create an intolerably hostile working environment for MS. SCOTT that was calculated to, and did, drive her out of LIBERTY MUTUAL's employ, resulting ultimately in her constructive discharge.

125.    Each and every one of the instances of discriminatory treatment summarized above in Paragraphs 122 and 123 violated the proscriptions against discrimination on the basis of sex and age set forth in RCW § 49.60.180(2) and (3) and § 44.49.090(1) quoted in Paragraphs 120 and 121, *supra*, and, taken together, they constitute a continuing course and pattern of willful and intentional discriminatory acts for which there was no legitimate nondiscriminatory justification that was inflicted upon MS. SCOTT intentionally and with malice or in reckless disregard for MS. SCOTT's rights protected by the Washington Law Against Discrimination.

126.    Each and every one of the instances of discriminatory treatment summarized above in Paragraphs 122 and 123 violated the proscriptions against discrimination on the basis of sex and age set forth in RCW § 49.60.180(2) and (3) quoted in Paragraph 120, *supra*, and in RCW § 49.44.090 quoted in Paragraph 121,

*supra.* Taken together, this conduct constitutes a continuing course and pattern of willful and intentional discriminatory acts for which there was no legitimate nondiscriminatory justification that was inflicted upon MS. SCOTT with malice or in reckless disregard for MS. SCOTT's rights protected by the Washington Law Against Discrimination.

127.    Pursuant to RCW § 49.60.030, MS. SCOTT is entitled to recover, as a result of the discriminatory treatment to which she has been subjected by LIBERTY MUTUAL, her actual damages in an amount to be shown at trial, including back pay and front pay, together with her costs of suit, including attorney's fees, and any other appropriate remedy authorized by the Washington Law Against Discrimination or by the federal Civil Rights Act of 1964.

## IX.  SIXTH CLAIM

### (Retaliation in Violation of
### Washington Law Against Discrimination)

128.    Plaintiff incorporates, as if specifically re-alleged herein, all allegations set forth above in Paragraphs 1 through 127 of this her Complaint.

129.    Pursuant to RCW § 49.60.210,

> [i]t is an unfair practice for any employer . . . to discharge, expel, or otherwise discriminated against any person because he or she has opposed any practices forbidden by [the Washington Law Against Discrimination], or because he or she has filed a charge, testified, or assisted in any proceeding under [the Washington Law Against Discrimination].

130.    Sexual harassment and discrimination on the basis of sex and/or age are all prohibited by the Washington Law Against Discrimination.

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

131.   By reporting the sexual harassment to which she had been subjected by a male fellow LIBERTY MUTUAL employee in late March of 2019 (see ¶¶ 28-31, *supra*), and by authorizing her attorney's letter to LIBERTY MUTUAL's Chief Legal Officer on January 22, 2020 (see ¶ 67, *supra*, and **Exhibit "D"** hereto) MS. SCOTT engaged in activity protected under RCW § 49.60.210.

132.   By filing with the EEOC Charge No. 523-2020-00266 on November 15, 2019, along with her supplement thereto (see ¶¶ 65, *supra*, and **Exhibits "A"** and **"B"** hereto) and her subsequent amendment to said Charge on May 29, 2020 (see ¶ 66, *supra*, and **Exhibit "C"** hereto), MS. SCOTT engaged in activity protected under RCW § 49.60.210.

133.   The campaign of harassment and abuse whereby MS. SCOTT's career prospects and earning potential at LIBERTY MUTUAL were systematically destroyed and her stature with both other LIBERTY MUTUAL employees and clients outside LIBERTY MUTUAL was undermined by Ms. Galizia and Ms. Dornecker (see ¶¶ 32-64, 74-75, *supra*), with further subsequent contributions by Mr. Mohan after Ms. Galizia's departure from LIBERTY MUTUAL's employ (see ¶¶ 79-80, *supra*), all of which created a hostile work environment, were a direct result of animosities spawned by MS. SCOTT's having reported the aforementioned sexual harassment, by her having complained internally about the retaliatory and discriminatory treatment to which she was being subjected, and by her having reported said complaints to the EEOC. The campaign of harassment, retaliation, and discriminatory treatment to which MS. SCOTT was systematically subjected was calculated to, and ultimately did, create an intolerably

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

hostile working environment for MS. SCOTT, making it impossible for her to continue her career with LIBERTY MUTUAL.

134.    But for MS. SCOTT's having engaged in the protected activity of reporting the sexual harassment, retaliation, and discriminatory treatment to which she had been subjected, most or all of the incidents comprising the relentless and systematic campaign designed to make it impossible for her to continue her employment with LIBERTY MUTUAL, would not have occurred.

135.    The delivery of MS. SCOTT's transparently negative and wholly unjustified performance review by Ms. Galizia on January 28, 2020 (see ¶¶ 74-75, *supra*, and **Exhibit "E"** hereto), a mere six days after LIBERTY MUTUAL's Chief Legal Officer was put on notice of the details of the unlawful conduct to which MS. SCOTT had been subjected and the day immediately following LIBERTY MUTUAL's filing of its position statement responding to MS. SCOTT's EEOC Charge (see ¶¶ 72-74, *supra*, and **Exhibit "E"** hereto), was a direct result of MS. SCOTT's having reported the sexual harassment to which she had been subjected and/or her filing of her EEOC Charge and/or her attorney's having reported the details of the unlawful treatment to which she had been subjected.  Neither the negative review nor Ms. Galizia's effective invitation for MS. SCOTT to leave LIBERTY MUTUAL's employ during their conversation discussing the performance review would have occurred but for MS. SCOTT's having engaged in the protected activity as hereinbefore alleged.

136.    So intent were Ms. Galizia and Ms. Dornecker on retaliating against MS. SCOTT for having reported the sexual harassment to which she had been subjected, for

having filed her EEOC Charge, and for having reported complaints about her treatment to LIBERTY MUTUAL's Chief Legal Officer, that they made and implemented decisions manifestly contrary to LIBERTY MUTUAL's own best business interests, impeding if not destroying altogether LIBERTY MUTUAL's ability to realize a respectable return on its 2017 investments in the acquisitions of Ironshore and TRU (see ¶¶ 15-18, *supra*).

137.   LIBERTY MUTUAL acted and failed to act in willful, malicious, and intentional violation and/or in reckless disregard of MS. SCOTT's rights protected under RCW § 49.60.210.

138.   As a result of Defendant LIBERTY MUTUAL's retaliatory acts and omissions as hereinbefore alleged, MS. SCOTT has in the past and will in the future suffer injuries and damages, including but not limited to loss of employment, impairment of her demonstrated ability to produce extraordinary sales results and earn substantial incentive compensation thereby, violation of her contractual rights, mental and emotional distress, humiliation, intimidation, embarrassment, loss of income and benefits, loss of stature in the medical stop-loss sales industry, loss of future earnings, and loss of other emoluments of employment.

139.   As a result of the willful, malicious, and intentional retaliatory acts suffered by MS. SCOTT in violation of RCW § 49.60.210 , MS. SCOTT is entitled, pursuant to RCW § 49.60.030, to an award of backpay and front pay in an amount to be shown at trial in this matter, compensatory damages, punitive damages, attorney's fees, and the costs of litigation.

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

## X.   SEVENTH CLAIM

### (Breach of Contract in Violation of Washington Law)

140.   Plaintiff incorporates, as if specifically re-alleged herein, all allegations set forth above in Paragraphs 1 through 139 of this her Complaint.

141.   Among the terms offered by LIBERTY MUTUAL to induce MS. SCOTT to leave her then current employment and join the LIBERTY MUTUAL medical stop-loss insurance sales team were: (a) a substantial signing bonus to be paid in equal installments 30 and 90 days after commencement of her employment with LIBERTY MUTUAL; (b) the right to earn incentive compensation, in addition to her base salary, based on an agreed upon percentage of all premiums received by LIBERTY MUTUAL for all medical stop-loss product sales she originated, plus the same percentage of premiums received for all renewals of that business; (c) an agreement that her permanent territory upon joining LIBERTY MUTUAL would always include the Western United States and seven specifically identified national broker panels and general agents, where and with whom she had worked for many years to develop and solidify an extensive network of sales contacts; (d) one of her main responsibilities would be to help expand LIBERTY MUTUAL's medical stop loss insurance portfolio by developing and expanding business with broker panels and general agents, especially Stealth Partner Group, with which she had considerable experience and an excellent relationship cultivated over several years; and (e) an agreement that her incentive compensation arrangement would not be subject to change during her employment with LIBERTY MUTUAL.

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

142.   Based on and in reliance upon the terms offered to her as hereinbefore described, MS. SCOTT severed her relationship with her then current employer, accepted LIBERTY MUTUAL's offer, and commenced her employment with LIBERTY MUTUAL on July 16, 2018.

143.   MS. SCOTT's acceptance of the terms offered her by LIBERTY MUTUAL and her commencement of employment with LIBERTY MUTUAL on the understanding that those were, and would continue to be, among the key terms and conditions of her new employment gave rise to a valid and enforceable contract, imposing on LIBERTY MUTUAL a duty to honor its terms under the law of the State of Washington, MS. SCOTT's State of domicile.

144.   LIBERTY MUTUAL breached its contract with MS. SCOTT by: (a) failing without explanation to pay in timely fashion her agreed upon signing bonus; (b) unilateral termination of her right to receive any incentive compensation from medical stop-loss insurance sales to or through the very broker panels and general agents with whom she had been recruited to develop sales; (c) unilateral termination of her right to receive incentive compensation on renewals by any clients she had originated, or would in the future originate; (d) the unilateral removal of the Western United States from the territory in which she was allowed to cultivate and make sales of LIBERTY MUTUAL medical stop-loss products; (e) Ms. Galizia's taking from MS. SCOTT clients, including Stealth Partner Group, with whom MS. SCOTT had developed relationships prior to joining LIBERTY MUTUAL and with whom she had specifically been brought into LIBERTY MUTUAL to develop sales for LIBERTY MUTUAL's benefit, and from which she was

to realize the benefits of incentive compensation based on such sales; and (f) the effective elimination of any realistic prospects for sustaining the career and the level of total compensation that had been held out to her to induce her to join LIBERTY MUTUAL's medical stop-loss insurance sales force.

145.    As a result of the breaches described in Paragraph 144, *supra*, MS. SCOTT suffered severe economic losses in terms of incentive compensation she had already earned, and in terms of incentive compensation she justifiably anticipated being able to earn with LIBERTY MUTUAL in the foreseeable future.  In addition, as a direct and proximate result of LIBERTY MUTUAL's failure to honor its contractual obligations to MS. SCOTT, she has suffered serious damage to  her prospects for being able to earn incentive compensation at the levels she had historically been able to earn upon leaving LIBERTY MUTUAL to work in the medical stop-loss insurance sales industry elsewhere.

146.    As a result of LIBERTY MUTUAL's multiple breaches of its contractual obligations to MS. SCOTT, she is entitled to recover from LIBERTY MUTUAL compensatory damages in an amount commensurate with her losses to date, including interest on such amounts, along with her foreseeable future losses, to be established at trial.

## XI.   <u>EIGHTH CLAIM</u>

### (Breach of the Covenant of Good Faith and Fair Dealing
### in Violation of Washington Law)

147.    Plaintiff incorporates, as if specifically re-alleged herein, all allegations set forth above in Paragraphs 1 through 146 of this her Complaint.

148.    Under the law of the State of Washington, an implied covenant of good faith and fair dealing is read into contracts to whatever extent they leave the determination of any contract terms to the discretion of one of the parties to the contract. The implied covenant obligates the parties to a contract to cooperate with each other so that each may obtain the full benefit of good faith performance of the obligations undertaken in the contract, but the implied covenant cannot contradict terms or conditions for which the parties have bargained.

149.    To whatever extent LIBERTY MUTUAL retained discretion, under its contractual relationship with MS. SCOTT, with regard to any of the matters described and alleged as contract breaches in Paragraph 144, *supra*, its actions constituted breaches of the implied covenant of good faith and fair dealing.

150.    By breaching the implied covenant of good faith and fair dealing as hereinbefore alleged, LIBERTY MUTUAL deprived MS. SCOTT of the benefit of the bargain she struck in agreeing the join LIBERTY MUTUAL's medical stop-loss sales force, causing her severe economic losses in terms of incentive compensation she had already earned, and in terms of incentive compensation she justifiably anticipated being able to earn with LIBERTY MUTUAL in the foreseeable future.   In addition, LIBERTY MUTUAL's breaches of the implied covenant inflicted significant injury to MS. SCOTT's  prospects for being able to earn incentive compensation at the levels she had

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

historically been able to earn upon leaving LIBERTY MUTUAL to work elsewhere in the medical stop-loss insurance sales industry.

151.    As a result of LIBERTY MUTUAL's multiple breaches of its obligations to MS. SCOTT pursuant to the implied covenant of good faith and fair dealing under Washington law, she is entitled to recover from LIBERTY MUTUAL compensatory damages in an amount commensurate with her losses to date, along with her foreseeable future losses, to be established at trial, plus interest on such amounts.

## XII. <u>NINTH CLAIM</u>

### (Intentional Infliction of Emotional Distress)

152.    Plaintiff incorporates, as if specifically re-alleged herein, all allegations set forth above in Paragraphs 1 through 151 of this her Complaint.

153.    The campaign of harassment, ostracism, humiliation, and general career-wrecking inflicted on MS. SCOTT by Ms. Galizia and Ms. Dornecker (see ¶¶ 32, 38-39, 42-65, 68-70, *supra*, and **Exhibit "E"** hereto), whose effects continued to be sustained by Mr. Mohan through the time of MS. SCOTT's constructive discharge (see ¶ 79-80, 82, *supra*), was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and must be regarded as atrocious and utterly intolerable in a civilized community.

154.    The campaign of harassment, ostracism, humiliation, and general career-wrecking launched by Ms. Galizia and Ms. Dornecker was calculated to, and did,

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

proximately cause in MS. SCOTT severe mental and emotional distress and anguish such that no reasonable person could be expected to endure it.

155.    As a result of the injuries sustained by MS. SCOTT from the campaign of harassment, ostracism, humiliation, and general career-wrecking inflicted upon her by Ms. Galizia and Ms. Dornecker, with effects sustained and continued by Mr. Mohan, MS. SCOTT is entitled to recover from LIBERTY MUTUAL her direct compensatory and consequential damages in an amount to be shown at trial, and punitive damages in an amount sufficient to punish LIBERTY MUTUAL for the wrongful conduct of Ms. Galizia and Ms. Dornecker and to deter such conduct by LIBERTY MUTUAL and other employers in the future.

## XIII.   TENTH CLAIM

### (Unjust Enrichment)

156.    Plaintiff incorporates, as if specifically re-alleged herein, all allegations set forth above in Paragraphs 1 through 155 of this her Complaint.

157.    Under the law of the State of Washington, unjust enrichment occurs when one retains money or benefits that, in justice and equity, belong to another.

158.    Throughout her tenure as a sales representative in LIBERTY MUTUAL's medical stop-loss insurance sales force, MS. SCOTT worked to secure, and did secure, sales with her clients of LIBERTY MUTUAL medical stop-loss insurance products, all to the benefit of LIBERTY MUTUAL.

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

159.   MS. SCOTT and LIBERTY MUTUAL agreed, prior to commencement of her employment as a LIBERTY MUTUAL sales representative, that fair compensation for any sales of LIBERTY MUTUAL medical stop-loss insurance products that she originated would be a specified percentage of premiums paid to LIBERTY MUTUAL from those sales, and from any renewals of business from those clients.

160.   LIBERTY MUTUAL's multiple breaches of its contractual obligations, including but not limited to its unilateral decisions to no longer pay incentive compensation for sales made to or through broker panels or general agents and to discontinue paying incentive compensation for renewals amounted to a repudiation of the contractual arrangement with MS. SCOTT whereby she was assured of compensation for business she brought in, and for all renewal business from her clients.

161.   As a result of LIBERTY MUTUAL's repudiation of its contractual arrangement and undertakings with MS. SCOTT, there have been premiums received by LIBERTY MUTUAL, both before and after MS. SCOTT's constructive discharge, on sales originated by her and/or on renewal business from clients with whom she originated sales, all to the benefit of LIBERTY MUTUAL, but as to which no compensation has been paid to MS. SCOTT.

162.   There will continue to be, for some time to come, premiums received by LIBERTY MUTUAL from sales originated by MS. SCOTT and/or from renewal business from clients with whom she originated sales, and as to which, but for LIBERTY MUTUAL's repudiation of its contractual arrangement with, and its unlawful constructive discharge of, MS. SCOTT, LIBERTY MUTUAL would have been

64

contractually bound to pay incentive compensation at the agreed upon percentage rate of the premiums received.

163.   To the extent that LIBERTY MUTUAL has benefitted from the exertions of MS. SCOTT in producing sales of LIBERTY MUTUAL's medical stop loss insurance products and has withheld from MS. SCOTT incentive compensation for her services at the rate the parties had previously agreed constituted reasonable compensation on premiums received, LIBERTY MUTUAL has been unjustly enriched.

164.   To the extent that LIBERTY MUTUAL will in the future benefit from the exertions of MS. SCOTT during her tenure as a sales representative in LIBERTY MUTUAL's employ in producing sales of LIBERTY MUTUAL's medical stop loss insurance products, LIBERTY MUTUAL will be unjustly enriched if it withholds from her incentive compensation at the rate the parties had previously agreed constituted reasonable compensation for her services.

165.   During her tenure as a LIBERTY MUTUAL medical stop-loss sales representative, MS. SCOTT incurred substantial business-related travel and client entertainment expenses, all of which were approved by her managers and for which she had submitted expense reports seeking reimbursement, but all of which remain unreimbursed by LIBERTY MUTUAL as of the date of the commencement of this action.   To the extent that LIBERTY MUTUAL has retained amounts for business expenses incurred by MS. SCOTT and for which she is entitled to reimbursement, LIBERTY MUTUAL has been unjustly enriched.

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

166.    MS. SCOTT is entitled to an accounting of all premiums received and all premiums to be received from sales of LIBERTY MUTUAL medical stop loss insurance products originated by MS. SCOTT, and premiums received from any renewals of that business.

167.    MS. SCOTT is entitled to an order from this Court requiring restitution at the agreed upon percentage rate of all such premiums received or to be received by LIBERTY MUTUAL resulting from exertions of MS. SCOTT in her capacity as a LIBERTY MUTUAL medical stop-loss sales representative, requiring restitution of all amounts incurred by her as business expenses on LIBERTY MUTUAL's behalf that remain unreimbursed, and awarding MS. SCOTT interest on all such amounts.

## XIV.  ELEVENTH CLAIM

### (Violation of Washington Wage Payment Statutes)

168.    Plaintiff incorporates, as if specifically re-alleged herein, all allegations set forth above in Paragraphs 1 through 167 of this her Complaint.

169.    RCWA § 49.52.050 makes it unlawful for any employer to, among other things:

(2)    Willfully and with intent to deprive the employee of any part of his or her wages, . . . pay any employee a lower wage than the wage such employer is obligated to pay such employee by any statute, ordinance, or contract . . . .

170.    RCWA § 49.48.010 requires, in pertinent part:

When any employee shall cease to work for an employer, whether by discharge or by voluntary withdrawal, the wages due him or her on account of his or her

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

employment shall be paid to him or her at the end of the established pay period . . . . ”

171.    The right to recover allowable business expenses incurred by an employee for the benefit of his or her employer constitutes “wages” within the meaning of RCWA § 49.52.050.

172.    MS. SCOTT, throughout the term of her employment with LIBERTY MUTUAL, was a “sales representative” within the meaning of RCWA § 49.48.150(3).

173.    Pursuant to and within the meaning of RCWA § 49.48.160(1), MS. SCOTT had a written contract with LIBERTY MUTUAL providing that she was to be paid commissions on all sales she generated at a specified percentage rate, and further commissions at the same rate on all renewals of business subsequently flowing from those sales.

174.    Although Ms. Galizia and Ms. Dornecker refused to honor the terms of MS. SCOTT’s written contract and willfully violated those terms, the contract itself was never amended.

175.    Pursuant to RCWA § 49.48.160(3)(b) and (d), LIBERTY MUTUAL was required to pay all commissions “and all other moneys earned or payable in accordance with the agreed terms of [MS. SCOTT’s] contract, but no later than thirty days after receipt of payment by [LIBERTY MUTUAL] for products . . . sold on behalf of [LIBERTY MUTUAL] by [MS. SCOTT],” and upon the termination of MS. SCOTT’s employment with LIBERTY MUTUAL, “all commissions due to [MS. SCOTT were required to] be paid within thirty days after receipt of payment by [LIBERTY MUTUAL]

for products . . . sold on behalf of [LIBERTY MUTUAL] by [MS. SCOTT], including earned commissions not due when [her] contract terminated."

176.    LIBERTY MUTUAL has failed and refused, and is continuing to fail and refuse, to pay MS. SCOTT for commissions due her, and it is continuing to fail or refuse to provide reimbursement of business expenses, as are all required to be paid by the aforementioned Washington statutes.

177.    As a result of LIBERTY MUTUAL's unlawful failure and refusal to pay MS. SCOTT for commissions due and for business expenses for which she is entitled to reimbursement, LIBERTY MUTUAL is liable, pursuant to RCWA § 49.52.070 "for twice the amount of the wages unlawfully . . . withheld by way of exemplary damages, together with costs of suit and a reasonable sum for attorney's fees . . . ."

## XV.   <u>TWELFTH CLAIM</u>

### (Negligent Training and Supervision Under Washington Law)

178.    Plaintiff incorporates, as if specifically re-alleged herein, all allegations set forth above in Paragraphs 1 through 177 of this her Complaint.

179.    LIBERTY MUTUAL has internal policies, announced to all its employees, prohibiting discrimination against its employees on the basis of, *inter alia*, sex and age, and further prohibiting retaliation against employees who come forward to report unlawful conduct, including sexual harassment.

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

68

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

180.    LIBERTY MUTUAL has a further internal policy, also announced to all employees, that all interactions "with our customers, policy holders, business partners and each other" are to be governed by "the principles of honesty, integrity and doing the right thing."

181.    The campaign of retaliation, harassment, ostracism, and discriminatory treatment launched and maintained relentlessly against MS. SCOTT by Ms. Galizia and Ms. Dornecker was not only unlawful as hereinbefore alleged, but it also clearly violated the announced policies of LIBERTY MUTUAL.  As such, the conduct of Ms. Galizia and Ms. Dornecker was outside the scope of their employment as LIBERTY MUTUAL supervisory/managerial employees.

182.    With respect to Ms. Galizia, LIBERTY MUTUAL knew or should have known that she had a propensity toward unlawful conduct based on publicly available information from *One Beacon Professional Insurance, Inc. v. Theresa Galizia*, United States District Court for the District of Connecticut Case No. 3:12-cv-00989-MRK ("the *One Beacon* Case"), the Complaint and Stipulated Injunction from which are attached hereto as **Exhibits "F"** and **"G**."   The *One Beacon* Case revealed a proclivity on Ms. Galizia's part for dishonest, unethical, fraudulent, and even criminal conduct designed to advance her own pecuniary interests at the expense of the interests of others.  If not sufficient to disqualify Ms. Galizia from a management position altogether, this certainly should have been enough to put LIBERTY MUTUAL on notice of the need to monitor her conduct carefully, and to be prepared to step in promptly if such tendencies began to manifest themselves during Ms. Galizia's tenure with LIBERTY MUTUAL.   As it

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

happened, however, Ms. Galizia was left to ride roughshod over the rights of MS. SCOTT, and to act with apparent impunity in doing so.

183. Whether or not LIBERTY MUTUAL was actually aware of Ms. Galizia's checkered past as described in ¶ 182, *supra*, prior to January 22, 2020, it was put on notice of these facts on receipt by LIBERTY MUTUAL's Chief Legal Officer of the letter MS. SCOTT's counsel sent to him on that date (see ¶ 72, *supra*).

184. LIBERTY MUTUAL management knew or should have known of Ms. Galizia's and Ms. Dornecker's conduct toward MS. SCOTT that was both unlawful as hereinbefore alleged and violative of clear company policies, well in advance of the January 22, 2020 letter from MS. SCOTT's counsel to LIBERTY MUTUAL's Chief Legal Officer, and yet no one from LIBERTY MUTUAL management made any attempt, before or after the January 22, 2020 letter, to intervene to bring about a cessation of the campaign against MS. SCOTT on which Ms. Galizia and Ms. Dornecker had embarked, or otherwise to rectify or in any way address the situation.

185. Apart from the malicious campaign to drive MS. SCOTT out of LIBERTY MUTUAL, the mishandling of the response to MS. SCOTT's having reported the instance of sexual harassment to which she had been subject in March of 2019 by both Ms. Galizia and Ms. Dornecker (see ¶¶ 31-33, 38, *supra*) evidenced a failure on LIBERTY MUTUAL's part to provide adequate training for at least Ms. Galizia and Ms. Dornecker in the proper managerial response to such reports.

186. The failure of LIBERTY MUTUAL to provide adequate training to Ms. Galizia and Ms. Dornecker in the proper handling of responses to reports of sexual

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

harassment, the failure of LIBERTY MUTUAL management above Ms. Galizia and Ms. Dornecker to monitor their treatment of MS. SCOTT, the failure of LIBERTY MUTUAL management to intervene to demand the immediate cessation of conduct toward MS. SCOTT that was both unlawful and violative of company policies; and the failure after having been put on notice of the wrongful conduct of Ms. Galizia and Ms. Dornecker to do anything to rectify the wrongs that had been done to MS. SCOTT, all constituted the tort of negligent training and supervision under Washington Law.

187. As a direct and proximate result of Ms. Galizia's and Ms. Dornecker's conduct toward MS. SCOTT that was both unlawful and violative of company policy, MS. SCOTT suffered injuries in the form of drastically reduced compensation and opportunities for earning incentive compensation going forward, diminished stature in the medical stop loss insurance industry that greatly reduced her ability to earn a living in her chosen field after her involuntary departure from LIBERTY MUTUAL, and severe mental and emotional distress.

188. As a result of injuries suffered by MS. SCOTT in consequence of LIBERTY MUTUAL's negligent training and supervision of Ms. Galizia and Ms. Dornecker, MS. SCOTT is entitled to recover her actual damages, in an amount to be shown at trial, and her long-term consequential damages, plus interest.

## XVI.  THIRTEENTH CLAIM

**(Tortious Interference With Contract and Business Expectancy Under Washington Law)**

**WALKER & PESKIND, PLLC**
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

189.   Plaintiff incorporates, as if specifically re-alleged herein, all allegations set forth above in Paragraphs 1 through 188 of this her Complaint.

190.   In unilaterally abrogating without legal justification LIBERTY MUTUAL's contractual obligations to pay MS. SCOTT commissions at the agreed upon rate for sales made to broker panels and general agents and to pay commissions at the agreed upon rate for all renewals of that business, Ms. Galizia and Ms. Dornecker tortiously and without legal justification interfered with the contractual arrangement MS. SCOTT had negotiated with LIBERTY MUTUAL.

191.   In unilaterally abrogating without legal justification LIBERTY MUTUAL's contractual obligations to honor its commitments to MS. SCOTT that her permanent territory once she joined LIBERTY MUTUAL would include the Western United States and seven specifically identified brokers and general agents, and by taking clients MS. SCOTT had spent years developing from her, Ms. Galizia and Ms. Dornecker tortiously and without legal justification interfered with the contractual arrangement MS. SCOTT had negotiated with LIBERTY MUTUAL.

192.   MS. SCOTT had a reasonable business expectancy that, if she did not finish out her career in LIBERTY MUTUAL's employ, she would be able to secure employment with other employers in the medical stop loss insurance industry where she would be able to earn a living commensurate with that she had historically been able to earn prior to joining LIBERTY MUTUAL's medical stop loss sales force.

193.   As a result of the campaign of retaliation, harassment, and discriminatory treatment to which MS. SCOTT was subjected at the hands of Ms. Galizia and Ms.

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

Dornecker significant damage was done to MS. SCOTT's professional reputation in the medical stop loss insurance industry, leaving her unable to secure the type of employment that would yield earnings comparable to those she was able to command prior to her tenure with LIBERTY MUTUAL.

194.    LIBERTY MUTUAL is liable for the tortious interference by Ms. Galizia and Ms. Dornecker with the contractual arrangement MS. SCOTT had negotiated with LIBERTY MUTUAL, under the doctrine of *respondeat superior*, if Ms. Galizia's and Ms. Dornecker's conduct in this regard is considered to be within the scope of their employment, or under a negligent training and supervision theory, if such conduct is considered to be outside Ms. Galizia's and Ms. Dornecker's scope of employment.

195.    As a direct and proximate result of Ms. Galizia's and Ms. Dornecker's conduct in tortiously interfering with the contractual arrangement MS. SCOTT had negotiated with LIBERTY MUTUAL, MS. SCOTT suffered injuries in the form of drastically reduced compensation and opportunities for earning incentive compensation going forward, diminished stature in the medical stop loss insurance industry that greatly reduced her ability to earn a living in her chosen field after her involuntary departure from LIBERTY MUTUAL, and severe mental and emotional distress.

196.    As a result of injuries suffered by MS. SCOTT in consequence of Ms. Galizia's and Ms. Dornecker's tortious interference with the contractual arrangement MS. SCOTT had negotiated with LIBERTY MUTUAL, and with her business expectancy that her earning potential in the medical stop loss industry would not be diminished by virtue of her tenure with LIBERTY MUTUAL, MS. SCOTT is entitled to recover her actual

damages, in an amount to be shown at trial, her long-term consequential damages, plus interest, and punitive damages in an amount sufficient to punish LIBERTY MUTUAL for the wrongs done to MS. SCOTT and to deter LIBERTY MUTUAL and other employers from allowing in the future such tortious interference by their managers with the contracts and business expectancies of their employees.

## JURY TRIAL DEMANDED

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury of all issues in this action so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant as follows:

A.    *Finding* that Defendant LIBERTY MUTUAL unlawfully retaliated against Plaintiff MS. SCOTT as described above in Plaintiff's First Claim in violation of Section 704(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a);

B.    *Finding* that Defendant unlawfully discriminated against Plaintiff on the basis of her sex as described above in Plaintiff's Second Claim in violation Section 703(a)(1) of Title VII of the Civil Rights Act of 1964;

C.    *Finding* that Defendant unlawfully discriminated against Plaintiff on the basis of her age as described above in Plaintiff's Third Claim in violation of the Age Discrimination in Employment Act, 29 U.S.C. §623(a)(1) and (2);

D.      *Finding* that Defendant unlawfully retaliated against Plaintiff as described above in Plaintiff's Fourth Claim in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623(d);

E.      *Finding* that Defendant unlawfully discriminated against Plaintiff on the basis of her sex and age as described above in Plaintiff's Fifth Claim in violation of the Washington Law Against Discrimination, RCW §§ 49.60.180(d)(2) and (3) and 40.44.090(1);

F.      *Finding* that Defendant unlawfully retaliated against Plaintiff as described above in Plaintiff's Sixth Claim in violation of the Washington Law Against Discrimination, RCW § 49.60.210;

G.      *Finding* that Defendant breached its contractual obligations to Plaintiff as described above in Plaintiffs Seventh Claim in violation of Washington law;

H.      *Finding* that Defendant breached its obligations to Plaintiff under the implied covenant of good faith and fair dealing as described above in Plaintiff's Eighth Claim in violation of Washington law;

I.      *Finding* that Defendant's treatment of Plaintiff constituted the intentional infliction of mental distress as described above in Plaintiff's Ninth Claim in violation of Washington law;

J.      *Finding* that Defendant's retention of incentive compensation amounts for premiums received by Defendant from sales originated by Plaintiff or from renewals by clients to which Plaintiff sold LIBERTY MUTUAL medical stop-loss insurance products, the retention of incentive compensation amounts for any such premiums

received in the future, and the continuous retention of amounts due to MS. SCOTT as reimbursement of her business expenses, all constitute unjust enrichment under Washington law;

K.   *Finding* that Defendant's failure to pay compensation due to Plaintiff, and its failure to reimburse her for business expenses incurred while in Defendant's employ, as described above in Plaintiff's Eleventh Claim, constitute violations of RCWA §§ 49.48.010, 49.48.160(3)(b) and (d), and 49.52.050, and awarding Plaintiff an amount equal to twice the amount of such unpaid wages pursuant to RCWS § 49.52.070;

L.   *Awarding* Plaintiff backpay, front pay, compensatory damages, punitive damages, attorney's fees, taxable and nontaxable costs of litigation, prejudgment interest, post-judgment interest, and such further relief to which she might be entitled based on her First and Second Claims pursuant to 42 U.S.C. §§ 1981a and 2000e-5(g);

M.   *Awarding* Plaintiff reinstatement, backpay, front pay, liquidated damages, attorney's fees, taxable and nontaxable costs of litigation, prejudgment interest, post-judgment interest, and such further relief to which she may be entitled based on her Third and Fourth Claims pursuant to 29 U.S.C. §§ 216-217 and 626(b) and (c)(1);

N.   *Awarding* Plaintiff reinstatement, back pay, front pay, actual damages, prejudgment and post-judgment interest, attorney's fees, costs of litigation, and any other appropriate remedy to which she may be entitled based on her Fifth and Sixth Claims and as may be authorized under the Washington Law Against Discrimination;

O.   *Awarding* Plaintiff her direct and compensatory damages, along with damages for foreseeable future consequential damages, resulting from Defendant's

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336

breach of its contractual obligations to her as described above in Plaintiff's Seventh Claim;

P. *Awarding* Plaintiff her direct and compensatory damages, along with damages for foreseeable future consequential damages, resulting from Defendant's breach of its obligations to her under the implied covenant of good faith and fair dealing as described above in Plaintiff's Eighth Claim;

Q. *Awarding* Plaintiff her direct, compensatory, and punitive damages based on the intentional infliction of mental and emotional distress by Defendants' managers as described above in Plaintiff's Ninth Claim;

R. *Requiring* Defendant to produce an accounting reflecting and accounting for all premiums received by Defendant from sales originated by Plaintiff, all renewals of business by clients with whom Plaintiff originated such sales, and all premiums for sales credited to others as a consequence of MS. SCOTT's clients having been wrongfully wrested away from her, and *ordering* Defendant to provide Plaintiff restitution at the agreed upon percentage rate on all such premiums for which Defendant has not previously provided such incentive compensation, plus interest;

S. *Requiring* Defendant to provide reimbursement to Plaintiff for all business expenses incurred by her while in Defendant's employ for which she submitted expense reports that have not heretofore been reimbursed, plus interest;

T. *Requiring* Defendant, pursuant to MS. SCOTT's Tenth Claim and RCWA § 49.52.070, to pay Plaintiff twice the amount of commissions and expense reimbursements

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6636

unlawfully withheld from her as exemplary damages, plus her costs of suit and attorney's fees;

U.    *Awarding* Plaintiff her direct and compensatory damages, along with an amount for foreseeable future consequential damages, resulting from Defendant's negligent training and supervision of Ms. Galizia and Ms. Dornecker as described above in Plaintiff's Twelfth Claim;

V.    *Awarding* Plaintiff her direct and compensatory damages, along with an amount for foreseeable future consequential damages, resulting from the tortious interference with the contractual arrangement MS. SCOTT negotiated with LIBERTY MUTUAL, and the tortious interference with MS. SCOTT's reasonable business expectancy, as described above in Plaintiff's Thirteenth Claim, plus punitive damages; and

W.    *Providing* for such other and further relief as the Court deems just and proper in the circumstances.

DATED, this 5th day of June, 2021.

WALKER & PESKIND, PLLC

By: /s/ Richard K. Walker
      Richard K. Walker, Esquire
      8777 E. Via De Ventura, Ste 315
      Scottsdale, Arizona 85258
      Attorney for Plaintiff Sara E. Scott

WALKER & PESKIND, PLLC
Attorneys and Counselors
8777 E. Via De Ventura, Ste 315
Scottsdale, AZ 85258
Telephone: (480) 483-6336